CITY OF AURORA, Colorado; City of Thornton, Colorado; City of Westminster, Colorado; City of Brighton, Colorado; City of Broomfield, Colorado; and City of Federal Heights, Colorado; Petitioners,

v.

The BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF ADAMS, Colorado; and the following county officers in their official capacities: Helen Hill, Treasurer; Terry Funderburk, Finance Director; and David Wilson, Budget Officer; Respondents.

No. 95SC10.

Supreme Court of Colorado, En Banc.

June 10, 1996.

Rehearing Denied July 29, 1996.

Griffiths & Tanoue, P.C., Susan K. Griffiths, Denver, City of Aurora, Charles H. Richardson, Julia A. Bannon, Michael J. Hyman, Aurora, for Petitioners.

Robert J. Loew, Adams County Attorney, Ronald A. Carl, Assistant Adams County Attorney, Brighton, for Respondents.

Geoffrey T. Wilson, Denver, for Amicus Curiae Colorado Municipal League.

Bruce T. Barker, Weld County Attorney, Greeley, for Amicus Curiae Colorado Counties, Inc.

Justice MULLARKEY delivered the Opinion of the Court.

We granted certiorari to review the court of appeals' decision in *City of Aurora v. Board of County Comm'rs*, 902 P.2d 375 (Colo.App.1994). The court of appeals held that Adams County can allocate revenue from the specific ownership tax to the Adams County Road and Bridge Fund, irrespective of the allocation's effect on Adams County's duty to share its road and bridge tax revenues with the municipalities in its jurisdiction. Because we find that the General Assembly did not intend to restrict the ability of the Board of County Commissioners to manage the Adams County budget, we affirm the judgment of the court of appeals.

## I.

The petitioners, City of Aurora, Colorado; City of Thornton, Colorado; City of Westminster, Colorado; City of Brighton, Colorado; City of Broomfield, Colorado; and City of Federal Heights, Colorado (collectively referred to as the Cities), are all municipalities located partially or totally in Adams County, Colorado. The respondents, the Board of County Commissioners of the County of Adams, Colorado, and its officials (collectively referred to as Adams County), have traditionally allocated some revenue from the specific ownership tax to fund road and bridge construction throughout Adams County. Beginning in 1992, Adams County has allocated a majority of its specific ownership tax revenue to the Adams County Road and Bridge Fund (Road and Bridge Fund).

The Cities initiated this action in the district court seeking review of Adams County's action. The Cities contend that Adams County has effectively eliminated their revenue from the road and bridge tax and the shareback provision by using a majority of the revenue from the specific ownership tax to fund the Road and Bridge Fund. Adams County asserts that the procedure is within its budgeting powers and that it has been allocating under this format since the inception of the specific ownership tax in 1970.

The district court granted partial summary judgment in favor of the Cities, finding that (1) a preliminary injunction was unwarranted, and (2) the specific ownership tax revenue may not lawfully be allocated to the Road and Bridge Fund.

The court of appeals affirmed the denial of the preliminary injunction but on different grounds, and reversed the trial court's judgment. The court of appeals held that the specific ownership tax revenue may be lawfully allocated to the Road and Bridge Fund, and we granted certiorari.[1] We conclude that the specific ownership tax revenue may be lawfully allocated to the Road and Bridge Fund, and affirm the judgment of the court of appeals.

## II.

This case involves the interrelationship of two taxes: (1) the specific ownership tax, a state personal property tax imposed on motor vehicles; and (2) the county road and bridge tax, a county ad valorem property tax. To put this case in perspective, we will describe each tax.

---

1. We granted certiorari on the following issue:

    Did the court of appeals err in ruling a county may allocate its specific ownership tax revenue to its road and bridge fund?

The specific ownership tax is authorized by article X, section 6 of the Colorado Constitution and is implemented by a statutory scheme presently codified at sections 42–3–101 to –144, 17 C.R.S. (1995 Supp.).[2] Specific ownership taxes are collected in part by the county clerk and recorder and in part by the state with respect to interstate vehicles. The state remits a portion of its collections to each county based on the percentage of state roads located in the county. § 42–3–107(6), 17 C.R.S. (1995 Supp.). Each county in turn is required to apportion its share between itself and the political subdivisions located within the county. § 42–3–107(23), 17 C.R.S. (1995 Supp.).[3]

The road and bridge tax is an ad valorem property tax which the county is authorized to levy under section 43–2–203(2), 17 C.R.S. (1993). As its name suggests, the revenue from the tax is used to build and maintain county highways and bridges. Each municipality located within the county is entitled to a share of the road and bridge tax revenue collected by the county.[4]

The controversy in this case centers on the definition of the Road and Bridge Fund established by section 43–2–202(1), 17 C.R.S. (1993), which states:

A fund to be known as *the county road and bridge fund* is created and established in each county of this state. Such fund *shall consist of the revenue derived from the tax authorized to be levied under section 43–2–203* for road and bridge construction, maintenance, and administration, *all moneys received by the county from the state or federal governments* for expenditure on roads and bridges, *and any other moneys which may become available to the county for such purpose* . . . .

§ 43–2–202(1), 17 C.R.S. (1993) (emphasis added).

The Cities object to Adams County's practice contending that allocation of specific ownership tax revenue to the Road and Bridge Fund violates section 43–2–202(1), 17 C.R.S. (1993), the statute establishing the fund. The Cities allege that the increased allocation of specific ownership taxes to the Road and Bridge Fund reduced the road and bridge tax and correspondingly decreased the shareback revenues allocated to the Cities under the statute.

### III.

In interpreting the Road and Bridge Fund statute, we rely on the well-established rules of statutory interpretation. First, we look at the statutory language itself. *Colorado State Bd. of Medical Examiners v. Saddoris*, 825 P.2d 39, 42 (Colo. 1992). Where the statutory language is clear and certain, the statute should be construed as written. *Id.* Where, however, the statutory language is ambiguous or unclear, we may rely on other tools of statutory construction such as legislative history or administrative interpretation in order to discern and effectuate the legislative intent. *A.B. Hirschfeld Press, Inc. v. City & County of Denver*, 806 P.2d 917, 920 (Colo.1991); *Howard Elec. and Mechanical, Inc. v. Department of Revenue*, 771 P.2d 475, 478–79 (Colo. 1989).

### A.

Section 43–2–202 which governs the Road and Bridge Fund provides that the fund can include revenue from three sources: (1) the

*Each municipality* located in any county of this state *is entitled to receive* from the county road and bridge fund of the county wherein it is located *an amount equal to fifty percent of the revenue* accruing to said fund from extension only of the levy authorized to be *made under section 43–2–203* against valuation for assessment of all taxable property located within its separate boundaries . . . .

§ 43–2–202(2), 17 C.R.S. (1993) (emphasis added). The road and bridge tax shareback provision is at issue here.

---

2. The statute was amended and recodified effective January 1, 1995. No relevant changes were made in the statute and, for convenience, we refer to the current codification.

3. Both taxes have shareback provisions requiring Adams County to pay over some of the revenue generated by that tax to the Cities. The Cities do not challenge Adams County's compliance with the shareback provision in the specific ownership tax law. Only the road and bridge shareback provision is at issue here. *See* n. 4 *infra*.

4. The relevant portion of the statute states:

road and bridge tax; (2) state and federal programs; and (3) "any other moneys which may become available to the county for such purpose." The statute does not define the terms "any other moneys" or "may become available."

The Cities contend this statute must be read in conjunction with the statute controlling the Adams County General Fund (General Fund). The Cities assert that the specific ownership tax must be deposited into the General Fund and, once deposited, cannot be expended for roads and bridges. Section 30–25–105 creates a General Fund, and provides:

> A fund to be known as the county general fund is hereby created and established in each of the counties of the state of Colorado. *The county general fund shall consist of all county revenue except that specifically allocated by law for other purposes.*

§ 30–25–105, 12A C.R.S. (1986) (emphasis added). The Cities contend that because the specific ownership tax is not "specifically allocated by law" to a certain fund it must be deposited into the General Fund. Moreover, the Cities assert that section 30–25–106, 12A C.R.S. (1986), expressly prohibits allocations from the General Fund to road and bridge construction. Section 30–25–106 provides:

> The board of county commissioners is authorized to appropriate money from the county general fund for all ordinary county expenses ... *except expenditures for ... roads and bridges*....

§ 30–25–106(1), 12A C.R.S. (1986) (emphasis added).[5]

In response, Adams County contends that the language "any other moneys which may become available to the county for such purpose" gives the Adams County Board of Commissioners broad discretion to use "any" money to fund road and bridge construction

projects through the Road and Bridge Fund unless such usage is prohibited by law. Under its broad interpretation, "any" means all other revenue sources, including the specific ownership tax. *See Webster's Third New International Dictionary* 97 (3d ed. 1986) (defining "any" as "non-specific and expansive"). In addition, Adams County asserts that the specific ownership tax revenue is "specifically allocated by law" because the Board of Commissioners allocated the revenue to the Road and Bridge Fund in the 1992 Adams County budget. *See Black's Law Dictionary* 101 (6th ed. 1990) (defining "allocate" as "to prescribe a particular use for particular moneys"). Adams County relies on its broad discretionary budget powers under section 30–11–107(2)(a), 12A C.R.S. (1986), and the presumption of validity which accompanies an exercise of its budgetary powers under section 30–11–107(2)(b), 12A C.R.S. (1986), to assert its position.

## B.

Given that the statutory language is not clear with respect to whether the specific ownership tax revenue can be directly allocated to the Road and Bridge Fund, we must turn to other sources to construe section 43–2–202, 17 C.R.S. (1993). We look first to the legislative history and next to the administrative interpretation given to the statute since its enactment.

The legislation in question was enacted before the General Assembly adopted its current practice of tape recording its hearings and floor debates. However, the statutory amendments resulted from a 1969 report by the Highway Revenue Committee to the Colorado General Assembly recommending changes in what is now section 43–2–202.[6] The 1969 statute's list of possible rev-

---

5. There are two cases addressing the issue of "transferring" money between the General Fund and the Road and Bridge Fund. In *Greeley v. Board of County Comm'rs*, 644 P.2d 76, 77 (Colo. App.1981) and *City of Colorado Springs v. Board of County Comm'rs*, 648 P.2d 671, 672 (Colo.App. 1982), the court of appeals held that funds could not be transferred from the General Fund to the Road and Bridge Fund due to the prohibitory language in section 30–25–106, 12A C.R.S. (1986). However, the instant case is distinguish-

able in that the specific ownership taxes at issue were not deposited in the Adams County General Fund. Rather, upon receipt the revenue was allocated directly to the Adams County Road and Bridge Fund.

6. Before its amendment in 1970, the predecessor to section 43–2–202 provided:

> A fund to be known as the "county road and bridge fund" is hereby created and established

enue sources for the Road and Bridge Fund included "appropriation by county commissioners" and "all other moneys available for road and bridge purposes" instead of the current phrase "any other moneys which may become available for such purposes." The report recommended deleting the "appropriation" phrase and changing the "other moneys" phrase to the current version. In addition, the report suggested creating the revenue sharing program between the counties and their municipalities.[7]

Although the recommended statutory changes were made in 1970, the report did not discuss limiting the revenue sources for county road and bridge funds. Nor did it mention why the "appropriation" phrase was deleted and the "other moneys" language was changed. While we hesitate to read too much into the report's silence, it seems reasonable to conclude that the changes were seen as technical in nature and that the drafters did not intend to place significant new limitations on a county's budgetary powers.[8] As the court of appeals stated:

> [T]he 1970 amendments do not simply eliminate county appropriations as a method of funding for roads and bridges. The amended language provides for a road and bridge tax levy and broadens the "all other

moneys" provision to include all moneys "which may become available."

*City of Aurora,* 902 P.2d at 379.

■ Construing together sections 30–25–105 and 43–2–202, we conclude, as did the court of appeals, that Adams County may allocate to the Road and Bridge Fund any funds which are not restricted for some other purpose by constitutional provision or statute.

### C.

This interpretation is consistent with the interpretation given to the statute by the counties and the Division of Local Government. The record reflects that Adams County has consistently allocated specific ownership tax revenue to its Road and Bridge Fund; only the percentage so allocated has changed over time. In evidence are records of the Colorado Department of Transportation showing that the great majority of all Colorado counties rely on the specific ownership tax revenues to pay for roads and bridges. The Division of Local Government also has interpreted the statute as permitting use of specific ownership tax revenues for this purpose.[9] Indeed, we recognized in *Riverton Produce Co. v. State,* 871 P.2d 1213,

---

in each of the counties of the state of Colorado. The county road and bridge fund shall consist of all moneys received from state and federal sources to be expended by a county for road and bridge construction, maintenance and administration; *appropriation by the county commissioners;* and *all other moneys available* for road and bridge purposes.

§ 120–1–2, 6 C.R.S. (1963) (emphasis added).

7. The specific recommendation of the Highway Revenue Committee in its 1969 Report to the Colorado General Assembly regarding the creation of a shareback requirement is as follows:
> That the law relating to the county road and bridge levy and the county road and bridge fund be amended to provide that 50% of the revenue raised from the valuation of property located within the boundaries of a city or incorporated town by extension of the county road and bridge levy against such valuation be paid over to said city or town when collected by the county treasurer, with the provision that said city or town, by mutual agreement with the county, may elect to receive the equivalent of such amount in the form of materials furnished, or work performed within its boundaries, by the county, but in those cases where the annual amount of such revenue is estimat-

ed to be less than $2,000, the equivalent of such amount shall be receivable by such city or town only in the form of material furnished, or work performed within its boundaries, by the county.

> *Report to the Colorado General Assembly: Highway Revenue Committee* 9 (Dec. 1969).

8. When the legislature has intended to limit the revenue sources available to a county for a particular program, it has done so directly. *See, e.g.,* § 26–1–122, 11B C.R.S. (1995 Supp.) (Social Service Fund). The statute dictates that a county can utilize "other moneys" only to make up any budgetary shortfalls after the social services tax. *Colorado Dep't of Social Servs. v. Board of County Comm'rs,* 697 P.2d 1, 17 (Colo.1985). The Road and Bridge Fund creates no preference for utilization of the road and bridge tax and its attendant shareback provision over other sources of revenue.

9. Located within the Department of Local Affairs, the Division of Local Government gives assistance to local governments and is authorized among other things to conduct research on local government financial issues. § 24–32–104(1)(e), 10A C.R.S. (1988).

1228 (Colo.1994), the use of specific ownership taxes to fund road and bridge projects.

■ We often consider and give appropriate deference to the contemporaneous and consistent interpretation of a statute made by a governmental entity charged with its interpretation or enforcement. *El Paso County Bd. of Equalization v. Craddock*, 850 P.2d 702, 704–5 (Colo.1993). When, as here, the administrative interpretation is a reasonable construction of the statute consistent with public policy, we find it persuasive.[10] *Id.*

### D.

■ Finally, we are not willing to limit Adams County's discretion to manage its financial affairs without clear legislative authority mandating that result. A board of county commissioners is given a wide degree of discretion in determining budgetary matters for the county. § 30–11–107(2)(b), 12A C.R.S. (1986); *Beacom v. Board of County Comm'rs*, 657 P.2d 440, 446 (Colo.1983); *Tihonovich v. Williams*, 196 Colo. 144, 148, 582 P.2d 1051, 1054 (1978). Here, Adams County decided to allocate funds to a specific purpose and, in the absence of a legislative prohibition, its choice should be upheld.

### IV.

For these reasons, we affirm the judgment of the court of appeals.

VOLLACK, C.J., dissents, and LOHR and KIRSHBAUM, JJ., join in the dissent.

10. Article X, § 18 of the Colorado Constitution ties revenues generated by taxes on the operation of motor vehicles to the construction and maintenance of public highways. Although not directly applicable to the specific ownership tax, a state personal property tax on motor vehicles, this provision indicates that Adams County's allocation of these revenues to its Road and Bridge Fund is consistent with public policy.

1. A mill levy is a tax on property. Each mill represents $1 of tax assessment per $1000 of property value assessment. *See* Black's Law Dictionary 994 (6th Ed.1990).

2. Section 43–2–203(2) provides:

The board of county commissioners in each county is authorized to levy such rate of tax on all taxable property located within the county as required, when added to the estimated bal-

**Chief Justice VOLLACK dissenting:**

The majority affirms the court of appeals, which held that Adams County can allocate revenue derived from the specific ownership tax to the Adams County Road and Bridge Fund, and thus partially avoid its statutory obligation to share its road and bridge tax revenues with the municipalities in its jurisdiction. Because the plain language of the governing statutory schemes expressly prohibits such allocation, I dissent.

### I.

As this case involves numerous complex statutory schemes related to funding and taxation, I begin by engaging in a brief exposition on the relevant statutes. In Colorado, counties maintain county roads and bridges in the unincorporated portions of the counties. In order to finance the cost of such maintenance, counties are statutorily permitted to impose a road and bridge mill levy [1] on all taxable property within the county, including property within municipal boundaries. § 43–2–203(2), 17 C.R.S. (1993).[2] Municipalities, on the other hand, are solely responsible for maintenance of the roads and bridges within their municipal boundaries. §§ 43–2–123 to –124, 17 C.R.S. (1993).[3]

A county's road and bridge work is to be funded from a statutorily created county road and bridge fund. § 43–2–202, 17 C.R.S.

ance on hand at the beginning of said ensuing fiscal year and the amount of all revenues, other than property tax revenue, estimated to be received during said fiscal year, to defray all expenditures and payments estimated to be made from the county road and bridge fund during said fiscal year.

3. Section 43–2–123 provides:

City street systems. There shall be established in each city, city and county, and incorporated town a system of streets to be known as the city street system. It shall not include any street established by law as a part of the state highway system.
Section 43–2–124(4) provides:
The city streets system, both arterial and local service streets, shall be constructed and maintained by the respective city, city and county, or incorporated town.

(1993).[4] The sources of moneys for the county road and bridge fund are specified in the statute as follows: (1) The road and bridge mill levy authorized by section 43–2–203; (2) all moneys received by the county from the state or federal governments for expenditures on roads and bridges; and (3) any other moneys which may become available to the county for such purpose. Section 43–2–202 also includes an apportionment provision[5] (the "shareback provision") which provides that the municipalities located within a county are entitled to receive fifty percent of the revenue accruing to the county road and bridge fund deriving from the road and bridge mill levy authorized by section 43–2–203.

Article X, section 6, of the Colorado Constitution authorizes a specific ownership tax on certain vehicles.[6] In order to carry out this constitutional mandate, the General Assembly has levied a tax upon certain vehicles owned by Colorado residents. §§ 42–3–101 to –144, 17 C.R.S. (1993). Neither the constitutional provision authorizing the specific ownership tax, nor the implementing statutes, specifically allocate the revenues from the tax to the county road and bridge fund or to road and bridge purposes.

The county general fund is created by section 30–25–105, 12A C.R.S. (1986), which states that the general fund "shall consist of all county revenue except that specifically allocated by law for other purposes." Section 30–25–106, 12A C.R.S. (1986) specifically provides that the board of county commissioners is not authorized to appropriate money from the county general fund for expenditures for roads and bridges.[7]

## II.

The dispute in the instant case surrounds Adams County's practice of allocating a majority of the revenues it collects from its specific ownership tax to the Adams County Road and Bridge Fund. The effect of this allocation is that, since commencing this practice in 1992, Adams County has been able to drastically reduce its road and bridge mill levy, and thus correspondingly reduce the amount of revenue that it must allocate to the municipalities pursuant to the shareback provision. This is because the only revenue subject to the shareback provision from the Adams County Road and Bridge Fund is revenue from the road and bridge mill levy, and not revenue from the specific ownership tax.

Specifically, as part of the 1992 Adams County budget, the Adams County Board of Commissioners (the Board) allocated $3,400,000 in revenue from the specific ownership

4. Section 43–2–202(1) provides in pertinent part:

A fund to be known as the county road and bridge fund is created and established in each county of this state. Such fund shall consist of the revenue derived from the tax authorized to be levied under section 43–2–203 for road and bridge construction, maintenance, and administration, all moneys received by the county from the state or federal governments for expenditure on roads and bridges, and any other moneys which may become available to the county for such purpose.

5. Section 43–2–202(2) provides in pertinent part:

Each municipality located in any county of this state is entitled to receive from the county road and bridge fund of the county wherein it is located an amount equal to fifty percent of the revenue accruing to said fund from extension only of the levy authorized to be made under section 43–2–203 against the valuation for assessment of all taxable property located within its corporate boundaries.

6. Article X, section 6 of the Colorado Constitution provides in pertinent part:

The general assembly shall enact laws classifying motor vehicles ... prescribing methods of determining the taxable value of such property, and requiring payment of a graduated annual specific ownership tax thereon, which tax shall be in lieu of all ad valorem taxes upon such property....

....

Such graduated annual specific ownership tax shall be in addition to any state registration or license fees imposed on such property, shall be payable to a designated county officer at the same time as any such registration or license fees are payable, and shall be apportioned, distributed and paid over to the political subdivisions of the state in such manner as may be prescribed by law.

Colo. Const. art. X, § 6.

7. Section 30–25–106 provides in pertinent part:

The board of county commissioners is authorized to appropriate money from the county general fund for all ordinary county expenses ... except expenditures for ... roads and bridges....

tax to the Adams County Road and Bridge Fund. By allocating all of its specific ownership tax revenues to the Adams County Road and Bridge Fund, the Board was able to reduce Adams County's road and bridge mill levy from 4.433 mills in 1991 to 2.233 mills in 1992. The corresponding decrease in net revenues from the levy amounted to $3,921,-266 for the 1992 fiscal year. Because the shareback provision only provides for allocation to the cities of the revenue from the road and mill levy, this action on the part of Adams County reduced its payment to the cities by more than $1,700,000 between 1991 and 1992. At the same time, Adams County was able to increase its total expenditures on county road services, services which do not benefit the municipalities.

### III.

The majority holds that Adams County's allocation of the specific ownership tax to the Adams County Road and Bridge Fund was not prohibited, and was in fact authorized, by statute. Maj. op. at 202–203. After an exhaustive analysis of the concededly sparse legislative history of the relevant statutory schemes, the majority concludes that the General Assembly did not intend to limit the sources from which counties could allocate revenue to their road and bridge funds. Maj. op. at 201–203.

I agree with the majority's statement of the relevant rules of statutory construction. I dissent, however, because sections 30–25–105 and 30–25–106 manifestly prohibit the allocation of revenue from the specific ownership tax to the county road and bridge fund. I also dissent because I disagree with the majority's conclusion that section 43–2–202 authorizes such allocation. Because these statutes are clear and unambiguous, any inquiry into the legislative intent behind such statutes is unnecessary.

Where the language of a statute is clear, a court must construe the statute as it is written. *Dunton v. People*, 898 P.2d 571, 573 (Colo.1995). Statutes *in pari materia* should be construed together and harmonized if possible. *City of Lakewood v. Mavromatis*, 817 P.2d 90, 96 (Colo.1991). *In pari materia* is a rule of statutory construction which requires that statutes relating to the same subject matter be construed together in order to fully effectuate the intent of the legislature. *Walgreen Co. v. Charnes*, 819 P.2d 1039, 1043 (Colo.1991). A reviewing court should attempt to reconcile such statutes so as to give effect to all the provisions of each statute. *M.S. v. People*, 812 P.2d 632, 637 (Colo.1991).

### A.

The statutes relevant to this case, when read together and given their plain and ordinary meaning, unambiguously dictate that the revenues derived from the specific ownership tax must be deposited into the county general fund, rather than the county road and bridge fund. The statute establishing the county general fund states that "[t]he county general fund shall consist of all county revenue except that *specifically allocated by law for other purposes.*" § 30–25–105 (emphasis added). Nowhere in the statutory scheme implementing the specific ownership tax is the tax "specifically allocated" for road and bridge purposes. §§ 42–3–101 to –144. Nor does the Colorado constitutional provision which mandates the specific ownership tax specify how the revenue from the tax must be used.[8] Thus, section 30–25–105 read together with sections 42–3–101 to –144, dictates that the specific ownership tax must be deposited into the county general fund, rather than the county road and bridge fund.

Moreover, section 30–25–106 expressly prohibits the Board from utilizing revenue from the county general fund for expenditures for roads and bridges.[9] *Colorado Springs v. Board of County Comm'rs*, 648 P.2d 671, 671–72 (Colo.App.1982); *Greeley v. Board of County Comm'rs*, 644 P.2d 76, 77 (Colo.App.1981). Although the majority correctly points out that these cases are distinguishable because the specific ownership taxes in the instant case were never deposited in

8. *See supra* note 7 and accompanying text.

9. Section 30–25–106 also prohibits the Board from making expenditures from the general fund

for public welfare, debt service, public hospitals, public works, contingencies, and purposes voted by the electors.

the Adams County General Fund, the majority's interpretation of section 30–25–105 undermines the language of section 30–25–106. The Board could avoid the restrictions on the use of revenue from the county general fund by simply allocating revenue directly to one of the restricted purposes under section 30–25–106 instead of designating such revenue to the county general fund as required by section 30–25–105. The rules of statutory interpretation preclude us from interpreting a statute within a particular scheme so as to render a related statute a nullity. *People v. T.O.*, 696 P.2d 811, 817 (Colo.1985).

## B.

The majority also holds that section 43–2–202 allows counties to allocate revenue from the specific ownership tax to the county road and bridge fund. Section 43–2–202 states that the sources of moneys for the road and bridge fund are as follows: (1) The road and bridge mill levy authorized by section 43–2–203; (2) all moneys received by the county from the state or federal governments for expenditures on roads and bridges; and (3) any other moneys which may become available to the county for such purpose. The majority declares that the legislative history of section 43–2–202 supports the conclusion that the clause "any other moneys which may become available to the county for such purpose" authorizes counties to allocate revenue from the specific ownership tax to the county road and bridge fund. Maj. op. at 201–203.

Again, I would not resort to an analysis of the legislative history to interpret this section, because section 43–2–202 is unambiguous and does not authorize such an allocation of revenue. Reading the clause "any other moneys which may become available to the county for such purpose" in conjunction with the preceding phrase, "all moneys received by the county from the state or federal governments for expenditure on roads and

bridges," it is manifest that the words "such purpose" in the first clause mean "for expenditure on roads and bridges." As revenue derived from the specific ownership tax is not money designated for expenditures on roads and bridges, section 43–2–202 does not authorize the allocation of such funds to the county road and bridge fund.

Moreover, construing 43–2–202 to preclude the allocation of revenues to the county road and bridge fund that are not specifically designated to road and bridge purposes harmonizes section 43–2–202 with sections 30–25–105 and 30–25–106, consistent with our well-established principles of statutory construction. *City of Lakewood*, 817 P.2d at 96 (holding that statutes concerning related subject matters should be construed together and harmonized if possible). Under this construction, any revenue that is not specifically allocated by law for other purposes, pursuant to section 30–25–105, must be deposited into the county general fund. The county would be precluded from depositing or transferring such funds into the county road and bridge fund pursuant to sections 43–2–202, 30–25–105, and 30–25–106. This interpretation of the relevant statutes, as opposed to the majority's interpretation, harmonizes the statutes, giving effect to all provisions as required by our rules of statutory construction. *Walgreen Co.*, 819 P.2d at 1043; *City of Lakewood*, 817 P.2d at 96; *M.S. v. People*, 812 P.2d at 637.[10]

The majority also cites *Riverton Produce Co. v. State*, 871 P.2d 1213 (Colo.1994), for the proposition that in that case, this court "recognized ... the use of specific ownership taxes to fund road and bridge projects." Maj. op. at 203. In my opinion, *Riverton Produce* is inapposite to the instant case. In *Riverton Produce*, this court considered whether the registration fees and special ownership taxes mandated by sections 42–3–105 and 42–3–106 were constitutional under the Commerce Clause of the United States

---

10. The majority cites *El Paso County Board of Equalization v. Craddock*, 850 P.2d 702, 704–05 (Colo.1993) for the proposition that: "We often consider and give appropriate deference to the contemporaneous and consistent interpretation of a statute made by a governmental entity charged with its interpretation or enforcement." Maj. op. at 12. In *El Paso*, we also stated that "[c]ourts, of course, must interpret the law and are not bound by an agency decision that misapplies or misconstrues the law." *Id.* Because the Board has misconstrued the relevant statutes in this case, its interpretations and prior actions are not binding on this court.

Constitution. We held that the facial disparity in those sections between the tax rates applicable to interstate and certain intrastate vehicles violated the Commerce Clause. *Id.* at 1228. The use of special ownership taxes was not at issue in *Riverton Produce,* and we rendered no holding in that case regarding the use of the revenue from those taxes.

## IV.

I would hold, based on the foregoing analysis, that the Board's actions were improper because: (1) section 43–2–202 is unambiguous and its plain language does not authorize Adams County's allocation of the County's specific ownership tax revenue to the Adams County Road and Bridge Fund, and (2) sections 30–25–105 and 30–25–106 expressly preclude such allocation. Therefore, I dissent.

I am authorized to say that Justice LOHR and Justice KIRSHBAUM join in this dissent.