24CA1200 Colorado Medical Board v Singer 09-11-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA1200
Office of Administrative Courts
Case No. ME20180012

---

Colorado Medical Board,

Petitioner-Appellee,

v.

Jonathan Singer, D.O., license number DR-00292309,

Respondent-Appellant.

---

ORDER AFFIRMED

Division I
Opinion by JUDGE KUHN
Moultrie and Martinez*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 11, 2025

---

Philip J. Weiser, Attorney General, Ashley E. Moller, First Assistant Attorney General, Jenna H. Anderson, Senior Assistant Attorney General, Denver, Colorado, for Petitioner-Appellee

Hershey Decker Drake, Kari Hershey, Katherine Brim Hong, Lone Tree, Colorado, for Respondent-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1 Respondent, Jonathan Singer, D.O., appeals the Colorado Medical Board's revocation of his license to practice medicine in Colorado. We affirm.

## I. Background

¶ 2 Singer obtained his medical degree from the University of Iowa College of Osteopathic Medicine. He was first licensed in Wyoming in 1985. He held a Colorado Medical Board license from 1989 until the Board revoked his license in 2024. Singer held himself out as a "Family Practice Physician and Surgeon," and his Colorado practice focused on functional medicine.[1] Singer was also certified by the American Board of Holistic Medicine and practiced a blend of traditional and alternative medicine.

¶ 3 Singer has had a long history with the Colorado Medical Board (the Board). In the last twenty-five years, the Board has imposed suspensions, probation, education requirements, practice restrictions, and monitoring requirements on his license. In May 1999, the Board issued an amended final board order restricting

---

[1] Singer describes functional medicine as "tr[ying] to discover the underlying cause of illness and treat the underlying cause, rather than apply treatment to treat symptoms."

Singer from providing hormone replacement therapy with hormones other than progesterone and estrogen while practicing in Colorado. The 1999 Order also required that "[a]ll patients for whom [Singer] provides other types of hormone replacement therapy other than [p]rogesterone or [e]strogen therapy must be referred to another health care provider who may legally provide this type of therapy." Additionally, the order stated that "[a]t all times during which [Singer] is physically located in Colorado, all medical decisions and orders, including the prescription of medications by telephone, and regardless of the location of his patient, constitute the practice of medicine in Colorado."

¶ 4 Then, in September 2016, Singer entered into a stipulation and order with the Board to resolve seven separate investigations into allegations of unprofessional conduct. Within the 2016 Stipulation, Singer admitted to a single violation of the hormone practice restriction. The 2016 Stipulation also contained a hormone practice restriction similar to the restriction in the 1999 Order, including the prohibition against "all medical decisions and orders" related to hormone replacement therapy and the referral requirements. Additionally, the 2016 Stipulation included a

2

provision that if Singer committed any act or omission constituting unprofessional conduct under section 12-36-117, C.R.S. 2016, his license would be revoked.[2]  In connection with the 2016 Stipulation, the Board appointed Dr. Floyd Russak as Singer's practice monitor.

¶ 5     In 2018, the Board filed a new complaint regarding Singer's care of Patients A and D.  The Board amended its complaint in 2019.  Then, after multiple delays, the matter proceeded to a hearing in August 2023.  At the hearing, the administrative law judge (ALJ) heard testimony from Singer, Dr. Russak, and Dr. Tarek Arja, the Board's expert witness.

¶ 6     As relevant to this appeal, the testimony and other evidence presented at the hearing demonstrates that Singer provided multiple treatments to Patient A in 2014 for asthma and acute asthma exacerbations.  During an early 2014 visit — when Patient A was having an asthma attack — Singer tested her blood oxygen level and listened to her breathing with a stethoscope.  He measured her respiratory function using a "pitch test," where he

---

[2] Section 12-36-117, C.R.S. 2016, titled "Unprofessional conduct," was repealed and replaced by section 12-240-121, C.R.S. 2025. Ch. 136, sec. 1, § 12-240-121, 2019 Colo. Sess. Laws 1190.

listened to the sound of air coming from her mouth. He then treated her with epinephrine, also known as adrenaline, instead of the drug albuterol, which is commonly used as a first-line treatment for patients experiencing that condition. Singer didn't perform a "FEF1"[3] test that measures lung function using a spirometer, a device that tests expiratory flow rate. He also did not perform follow-up measurements of her heart rate or oxygen level.

¶ 7    Later in 2014, Singer saw Patient A at his Wyoming office as she was in acute distress from an asthma attack. Her blood oxygen saturation was only 82%, a dangerously low level. He gave her oxygen and epinephrine and, again, conducted a pitch test. He didn't do an FEF1 test, use a spirometer, or conduct serialized oxygen level testing before sending her home. Additionally, Singer didn't make a full SOAP[4] note for the visit until early 2017, over two years later. At the hearing, Singer admitted that his notetaking and documentation for Patient A's visit didn't meet the accepted

---

[3] "FEF1" stands for forced expiratory flowrate over one second.

[4] "SOAP" is an acronym for "Subjective, Objective, Assessment, Plan" and is the common method for medical providers to document their treatment of patients.

standard of care, but he also testified that his documentation had improved since working with Dr. Russak.

¶ 8    As for Patient D, Singer first met with her in March 2018 for hormone imbalances and pain.  He had her undergo testing and reviewed the results with her in his Colorado office.  Later, he met with her at his Wyoming office, where he prescribed her the hormone testosterone.

¶ 9    After the Wyoming visit, Patient D continued to have complaints of pain, and Singer ordered a CT scan of her abdominal and pelvic regions.  He received the radiologist's report in mid-May and reviewed it the next day.  The report stated that Patient D could be suffering from pelvic inflammatory disease, which can be serious.  But Singer didn't inform Patient D of the results of the scan until approximately six weeks later.  He then referred her to a gynecologist for further follow-up and treatment.  Additionally, while Patient D was in his care, Singer had her stop and start progesterone treatment without ordering tests to determine her hormone levels.

¶ 10    The ALJ found that the Board had demonstrated three counts of unprofessional conduct by Singer.  First, Singer failed to meet

generally accepted standards of medical practice for Patients A and D, resulting in two violations of the Colorado Medical Practice Act, §§ 12-240-101 to -147, C.R.S. 2025. Second, Singer violated prior Board orders and section 12-240-121(1)(n), C.R.S. 2025, by directing Patient D to Wyoming so that she could receive testosterone. And third, Singer violated section 12-240-121(1)(v) by falsifying or repeatedly making incorrect essential entries or repeatedly failing to make essential entries on Patient A's records.

¶ 11 The ALJ issued the initial decision revoking Singer's license, and Singer filed exceptions to the decision with the Board's hearings panel. The Board's hearings panel unanimously agreed with the ALJ's findings and issued a final order revoking Singer's license to practice medicine in Colorado. This appeal followed.

## II. Analysis

¶ 12 Singer contends that the Board erred by (1) failing to prove allegations of substandard practice through testimony of an expert qualified in alternative medicine practices; (2) imposing discipline for medical practice occurring outside Colorado, when such practice is lawful in the other state; and (3) disciplining him for conduct he remedied and that was subject to a prior stipulation. We first set

6

forth the standard of review before addressing each contention in turn.

### A. Standard of Review and Applicable Law

¶ 13 Section 24-4-106(7), C.R.S. 2025, sets forth the standard of review for agency actions. We will affirm the agency's decision unless it is arbitrary or capricious, unsupported by the evidence in the record, or contrary to law. *Coffman v. Colo. Common Cause,* 102 P.3d 999, 1005 (Colo. 2004); § 24-4-106(7)(a) ("If the court finds no error, it shall affirm the agency action.").

¶ 14 "When reviewing final agency actions, we . . . must examine the record in the light most favorable to the agency decision. Whether the record contains substantial evidence to support the agency decision is a question of law." *Rigmaiden v. Colo. Dep't of Health Care Pol'y & Fin.,* 155 P.3d 498, 501 (Colo. App. 2006).

¶ 15 "In reviewing the agency's construction [of a statute], we rely on the basic rules of statutory construction, affording the language of the provisions at issue their ordinary and common sense meaning." *City of Commerce City v. Enclave W., Inc.,* 185 P.3d 174, 178 (Colo. 2008). Our primary task when interpreting a statute is to give effect to the intent of the drafters. *Waste Mgmt. of Colo., Inc.*

*v. City of Commerce City*, 250 P.3d 722, 725 (Colo. App. 2010). "It is axiomatic that we look to the language of the statute to determine legislative intent." *Coffman*, 102 P.3d at 1005. "If the language of the provision at issue is clear and the intent of the legislative body that enacted it may be discerned with certainty, we may not resort to other rules of statutory interpretation." *Colo. Health Consultants v. City & County of Denver*, 2018 COA 135, ¶ 13.

¶ 16     If the statute is ambiguous, we generally give deference to an agency's reasonable interpretation of a statute that it is authorized to administer and enforce.[5] *See id.* at ¶ 12. But "although we find persuasive an administrative interpretation of statute that is a reasonable construction consistent with public policy, it is for this court to determine all questions of law, interpret applicable statutes, and apply such interpretations to the facts." *Coffman*, 102

---

[5] Singer argues that *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024), prohibits courts from deferring to an agency's interpretation of the law. However, *Loper Bright* dictates how courts review federal agency actions under the federal Administrative Procedure Act, 5 U.S.C. §§ 500-596. It is not applicable to this action. *See Colo. Educ. Ass'n v. Colo. State Bd. of Educ.*, 2025 COA 56, ¶ 14 ("But we aren't persuaded that *Loper [Bright]* has any bearing on the level of deference we should or may give to state agencies under Colorado law.").

P.3d at 1005 (first citing *City of Aurora v. Bd. of Cnty. Comm'rs*, 919 P.2d 198, 203 (Colo. 1996); and then citing *Regents of the Univ. of Colo. v. Meyer*, 899 P.2d 316, 317 (Colo. App. 1995)). "Likewise, even though an agency construction of statute should be given appropriate deference, its interpretation is not binding on this court." *Id.* As a result, while not bound, we may accept the agency's construction of the law if it's reasonable and warranted by the record. *Sierra Club v. Billingsley*, 166 P.3d 309, 312 (Colo. App. 2007).

### B. The Board's Decision Was Supported by Applicable Expert Testimony

¶ 17 Singer contends that the Board violated section 12-240-121(5)(a) when it disciplined him without presenting any testimony from an expert qualified to render opinions on alternative medicine practices.[6] That section provides that "[t]he [B]oard shall not take disciplinary action against a licensee solely on the grounds

---

[6] The Board characterizes Singer's argument as challenging Dr. Arja's qualifications under CRE 702 and contests preservation of the issue for appeal. We do not read Singer's argument as making this challenge and determine that his argument is preserved because he raised it in the administrative proceeding. *See CTS Invs., LLC v. Garfield Cnty. Bd. of Equalization*, 2013 COA 30, ¶ 14.

that the licensee practices alternative medicine."

§ 12-240-121(5)(a). Singer argues that this language codifies the field of alternative medicine. Thus, he continues, the statute requires the Board to put on an expert witness qualified in alternative medicine before the Board can discipline him. We first address whether the statute codifies a specific field of medicine before turning to Singer's expert witness argument.

### 1. Section 12-240-121(5)(a) Does Not Codify a Field of Medicine

¶ 18    The Board's final order concluded that section 12-240-121(5)(a) does not create the field of alternative medicine. We agree with this interpretation.

¶ 19    Section 12-240-121 defines unprofessional conduct and, in doing so, states that,

> [f]or purposes of this section, "alternative medicine" means those health-care *methods* of diagnosis, treatment, or healing that are not generally used but that provide a reasonable potential for therapeutic gain in a patient's medical condition that is not outweighed by the risk of the *methods*. A licensee who practices alternative medicine shall inform each patient in writing, during the initial patient contact, of the licensee's education, experience, and credentials related to the alternative medicine practiced by the licensee.

> The [B]oard shall not take disciplinary action against a licensee *solely* on the grounds that the licensee practices alternative medicine.

§ 12-240-121(5)(a) (emphasis added).

¶ 20    By its plain language, this section prohibits the Board from disciplining a health care provider *solely* for using an alternative *method* of treatment where the potential for therapeutic gain is not outweighed by the risks. Nothing in the statutory text demonstrates an intent to codify alternative medicine as a distinct school of medicine; instead, it restricts the Board from disciplining a practitioner under certain circumstances. And "[w]hen the language is plain, the court must apply the text as written and not force or strain its interpretation." *Williams v. Dep't of Pub. Safety*, 2015 COA 180, ¶ 22. Further, while the Medical Practice Act does outline the scope of practice, licensing requirements and exceptions, and disciplinary actions that can be taken against medical practitioners for unprofessional conduct, it does not define any specific fields of medicine. *See* §§ 12-240-101 to -147. The legislature declined to define specific fields of medicine, "[a]nd it isn't our role to add such language." *People v. Brown*, 2019 CO 50, ¶ 17; *see also State Bd. of Med. Exam'rs v. McCroskey*, 880 P.2d

11

1188, 1194-95 (Colo. 1994) (noting that the Board must have discretion to determine the generally accepted standard of medical practice, which is the "same degree of knowledge, skill, and care as exercised by other physicians in the same field of medicine").

¶ 21    Thus, we discern no error in the Board's interpretation that section 12-240-121(5)(a) does not codify the specific field of alternative medicine.  We now turn to Singer's argument that, because he is a practitioner of alternative medicine, the Board erred by disciplining him without presenting testimony from an expert qualified in alternative medicine practices.

### 2.    The Board Presented Expert Testimony on the Generally Accepted Standard of Medical Practice

¶ 22    Section 12-240-121(1)(j) requires a practitioner to "meet [the] generally accepted standards of medical practice."  This standard usually "can be determined only by evaluation of the expert testimony in light of the controlling legal principles."  *McCroskey*, 880 P.2d at 1195.  And "the Board must have discretion to determine the generally accepted standard of medical practice in order to properly enforce the Medical Practice Act."  *Id.*

12

¶ 23    The Board first identified the medical standards applicable in this case as those of a physician treating the relevant medical complaints for Patients A and D — namely, asthma and pelvic pain. The Board considered the expert testimony from the hearing. Dr. Russak, Singer's expert and practice monitor, was qualified as an expert witness in internal, holistic, and alternative medicine.[7] Dr. Arja, the Board's expert, was qualified as an expert witness in family medicine but not alternative or holistic medicine. Generally, Dr. Russak testified that Singer's actions were not outside the standard of care under traditional and alternative medicine guidelines. But Dr. Arja testified that Singer's actions didn't meet the standard of care for a family medicine practitioner.

¶ 24    Singer argues that Dr. Arja's lack of qualifications in alternative or holistic medicine renders his opinions irrelevant

---

[7] To the extent that Singer asserts that the ALJ's determination that Dr. Russak was qualified to testify in holistic and alternative medicine creates or demonstrates the existence of the field of alternative medicine, he presents no argument as to how or why this expert's qualification under CRE 702 creates a field of medicine for the purposes of the Medical Practice Act. "And '[w]e don't consider undeveloped and unsupported arguments.'" *Frisco Lot 3 LLC v. Giberson Ltd. P'ship*, 2024 COA 125, ¶ 95 n.15 (quoting *Woodbridge Condo. Ass'n v. Lo Viento Blanco, LLC*, 2020 COA 34, ¶ 41 n.12).

because Singer practices alternative medicine and only an expert qualified in that practice area can testify about whether he met the standard of care.

¶ 25    However, the record does not support Singer's characterization of his medical practice. Instead, it demonstrates that Singer holds himself out as a "family medicine physician." His patient forms identify him as a "Family Practice Physician and Surgeon," and he holds a board certification in family medicine from the American Osteopathic Association. While Singer testified that he practices "a blend of alternative and traditional medicine," he also qualified that statement, testifying that "I always practice traditional medicine." Singer's inclusion of alternative medicine treatment methods within his family medicine practice does not mean that he is not practicing as a family medicine physician. Nor does it mean that the Board lacks the discretion to determine the generally accepted standard of medical practice that applies to his treatment. *See id.* at 1195-96. We note that the Board's determination that Singer was a family medicine practitioner also clearly refutes his argument that the Board violated section 12-240-121(5)(a) by disciplining him "solely on the grounds that [he] practices alternative medicine." While

Singer may have incorporated alternative treatments into his family medicine practice, that was not the rationale for the Board's discipline.

¶ 26    Additionally, we agree with the Board that "nothing in the record establishes that the treatment of asthma, or the use of epinephrine to treat asthma, constitutes the practice of alternative medicine." To the contrary, Dr. Russak, Singer's own expert, testified that while someone could consider the use of epinephrine as nontraditional or functional holistic medicine, "generally injectable drugs are not considered holistic." Further, the record contains no argument or evidence supporting the position that ordering a CT scan — or delayed reporting of its results — constitutes the practice of alternative medicine.

¶ 27    Based on the record before us, there is substantial factual support for the Board's implicit determination that Singer specializes in family medicine as a physician and its reliance on Dr. Arja's expert testimony to determine the generally accepted standard of medical practice for a family medicine practitioner.

¶ 28    Ultimately this case turned on dueling expert testimony, and the ALJ found Dr. Arja's testimony more persuasive. That

15

testimony provided evidentiary support for the Board's conclusion that Singer's treatment of Patients A and D fell below the generally accepted standards when he

- used a pitch test instead of evaluating FEF1 measured by a spirometer;

- administered epinephrine as a first-line treatment for asthma;

- failed to properly monitor Patient A's condition after asthma treatment;

- failed to timely address the findings of Patient D's CT scan;

- failed to convey to Patient D the seriousness and implications of the CT scan's finding;

- failed to timely refer Patient D to a specialist; and

- stopped Patient D's progesterone treatment without ordering a blood test of her hormone levels.

¶ 29 Singer does not dispute the evidence supporting these findings in the record. And when there is sufficient evidentiary support for the Board's determination, we will not disturb it. *See Coffman,* 102 P.3d at 1005. Thus, the Board's determination that Singer failed to meet generally accepted standards of practice in violation of section

12-240-121(1)(j) was not arbitrary or capricious, unsupported by evidence, or contrary to law. *See Coffman*, 102 P.3d at 1005.

### C.    The Board's Revocation Didn't Exceed Its Jurisdiction

¶ 30    Singer next contends that the Board exceeded its jurisdiction when it determined that he violated a valid Board order and section 12-240-121(1)(n) because, despite the Board's orders restricting hormone replacement therapy, he was lawfully practicing medicine under his Wyoming license. We disagree.

¶ 31    As stated above, the Board's 1999 Order and the 2016 Stipulation prohibited Singer from engaging in "all medical decisions and orders" related to hormone replacement therapy, other than progesterone and estrogen. Additionally, both documents required him to refer all patients to another provider for any other types of hormone therapies. However, neither restriction applied to Singer's Wyoming practice.

¶ 32    The Board concluded that Singer violated the 1999 Order and the 2016 Stipulation when he, while in Colorado, made a treatment decision to prescribe Patient D testosterone and directed her to his Wyoming office where he later wrote the prescription.

17

¶ 33     Singer argues that the Board imposed extraterritorial discipline on him for writing a prescription in Wyoming under his Wyoming license.[8]  To the extent Singer asserts that the Board has no jurisdiction over his Wyoming license, we agree.  However, his argument disregards the actions he took in Colorado and the language of the 1999 Order and the 2016 Stipulation.

¶ 34     In response to Patient D's complaint to the Board, Singer wrote to the Board that he told Patient D he "could prescribe estrogen and progesterone, but that [he] was not at liberty to prescribe testosterone in [his] Colorado office.  [He] offered to see the patient at [his] Cheyenne, Wyoming[,] office, where [he was] able to prescribe such medication, or she could seek the prescription from another provider."  For her part, Patient D recounted the interaction somewhat differently.  In her complaint, she said, "I question why having to cross state lines to get a testosterone

---

[8] In his reply brief, Singer argues for the first time that the Board may not discipline a licensee for a thought process.  We do not consider arguments raised for the first time in a reply brief.  *Gomez v. Walker*, 2023 COA 79, ¶ 9 n.3.  Regardless, the Board undoubtedly has the authority to regulate medical decision-making and diagnosis, even though they are thought-intensive processes.  *See* § 12-240-121(1)(j)-(v).

prescription only to find out that it could have been prescribed in the state of Colorado." Further, Singer's SOAP note, made while in his Colorado office, shows that his treatment plan for Patient D was a "F/U Cheyenne if she desires for low testosterone."

¶ 35 It is uncontested that Singer did not refer Patient D to another provider for treatment. The evidence in the record, particularly Patient D's complaint, supports the Board's conclusion that Singer made the medical decision to treat Patient D with testosterone while in Colorado rather than making a referral. And while we recognize that this may not be the only conclusion the Board could have drawn, it is within the agency's province to decide what weight to accord to each piece of evidence and to choose among conflicting inferences that may be drawn from it. *See Colo.-Ute Elec. Ass'n v. Pub. Utils. Comm'n*, 760 P.2d 627, 640 (Colo. 1988).

¶ 36 There is substantial evidence in the record to support the Board's determination that Singer violated the 1999 Order and the 2016 Stipulation. And because the Board's determination was based on medical decisions that Singer made in Colorado, it was not a regulation of his Wyoming license. Therefore, the Board did not exceed its jurisdiction. *See* § 24-4-106(7)(b)(IV).

### D. The Board's Determination on Documentation Was Supported by Evidence

¶ 37    Lastly, Singer contends that the Board erred by disciplining him for documentation failures despite these issues being resolved in the 2016 Stipulation.  In support, Singer argues that the doctrine of estoppel bars the Board from reconsidering his documentation and that the Board abused its discretion by doing so.  We disagree.

> Equitable estoppel is designed to achieve justice where four elements are present: (1) the party to be estopped by its conduct must know the facts; (2) that party must intend that the conduct be acted upon or must act so the party asserting estoppel is justified in believing the conduct was so intended; (3) the party asserting estoppel must be ignorant of the true facts; and (4) that party must detrimentally rely on the other party's conduct.

*Bontrager v. La Plata Elec. Ass'n*, 68 P.3d 555, 561 (Colo. App. 2003).  The record demonstrates that Singer didn't write the full SOAP note for the September 2014 appointment with Patient A until January 2017, after he received a letter from the Board concerning Patient A's complaint.  So there is a significant question as to whether the Board could have known the full scope of Singer's documentation for Patient A when he and the Board executed the 2016 Stipulation.  Regardless, the 2016 Stipulation didn't address

Patient A or her complaint, so the parties couldn't have intended the stipulation to cover documentation about Patient A's visit. As a result, his argument fails at the second estoppel element. *See id.*

¶ 38　　Singer's abuse of discretion argument is equally doomed. The Board found that Singer violated section 12-240-121(1)(v) and engaged in unprofessional conduct by falsifying or repeatedly making incorrect essential entries — or by repeatedly failing to make essential entries in the first place — on Patient A's records. At the hearing, Singer conceded that his notes failed to meet generally accepted standards of medical practice. Despite this, Singer argues that his previous discipline for other substandard recordkeeping and, as Dr. Russak testified, his subsequent improvement in his recordkeeping compel us to reverse the Board's decision.

¶ 39　　In essence, Singer asks us to reweigh the evidence in his favor, setting aside his own testimony and the uncontested fact that he edited his notes nearly three years after Patient A's treatment. That is not our role. The Board's determination is substantially supported by evidence in the record, and its decision is not

arbitrary or capricious. *See Baldwin v. Huber*, 223 P.3d 150, 152 (Colo. App. 2009).

### III.    Disposition

¶ 40    The Board's order is affirmed.

JUDGE MOULTRIE and JUSTICE MARTINEZ concur.