**COLORADO COMMON CAUSE, a registered not-for-profit corporation, and Pete Maysmith, Executive Director of Colorado Common Cause, Complainants–Appellees,**

v.

**Mike COFFMAN, Colorado State Treasurer, Respondent–Appellant.**

No. 01CA1709.

Colorado Court of Appeals, Div. V.

March 27, 2003.

As Modified on Denial of Rehearing

May 29, 2003.*

Certiorari Granted March 1, 2004.

Beimford & Gleason, P.C., Richard J. Gleason, Denver, Colorado, for Complainants–Appellees.

Ken Salazar, Attorney General, Maurice Knaizer, Assistant Attorney General, M. Terry Fox, Assistant Attorney General, Denver, Colorado, for Respondent–Appellant.

Opinion by Judge JONES.

Respondent, Mike Coffman, State Treasurer, who leads the Office of the State Treasurer, appeals the order of an administrative law judge (ALJ) against him and in favor of complainants, Colorado Common Cause, and Pete Maysmith, its executive director. The ALJ imposed a civil penalty, finding that the Treasurer willfully violated § 1–45–117, C.R.S.2002, of the Fair Campaign Practices Act (FCPA). We affirm.

The November 2000 election included a state-wide ballot initiative, known as Amendment 23, providing for amendment of the Colorado Constitution to require the state to set aside certain revenues each fiscal year for the State Education Fund.

The parties here concede that Amendment 23 constituted a "[s]tate-wide ballot issue" for purposes of § 1–45–117(1)(a)(I)(A), C.R.S. 2002. The voters approved the amendment.

Under the amendment, the fund is to be administered and invested under the aegis of the State Treasurer and is to be exempt from the TABOR Amendment limitations on fiscal year spending provided for in Colo. Const. art. X, § 20.

* JONES, J., does not participate.

Before the election, the Treasurer criticized, and urged the defeat of, the proposed amendment at a press conference and in three press releases, prepared and issued during official work hours and through use of public funds. He issued a fourth press release after the election.

The press releases were prepared during regular work hours by a staff member at the direction of the deputy treasurer, who reviewed and edited the drafts. The Treasurer conducted a press conference on September 7, 2002, to express opposition to the amendment. The staff member arranged for the dissemination of the first press release by e-mail, fax, and web posting. No further press conferences were held by the Treasurer, but the other releases were disseminated in October 2000.

The first press release was entitled, "Coffman: Amendment 23 a 'Fiscal Train Wreck.'" It stated, in part:

This terribly confusing and complex initiative ... promises nothing in return for a huge increase in spending. I don't think the authors of this initiative fully considered the effects of their amendment when they wrote it .... [It] provides only vague and general guidance for the spending of this money so that some of the more powerful legislators could easily steer this money to their districts for capital construction projects rather than where it is needed most: the classroom.

The second press release noted that the amendment would require the state's capital construction budgets to be reduced by more than $155 million over the following five years, and it characterized the amendment as a "carelessly written amendment [that] is so deeply flawed that I urge Colorado's voters to turn it down."

The third press release was entitled, "Coffman: Amendment 23 Deceptive." It stated that "when an economic downturn occurs the State Education Fund, like a sailor's wallet on the morning after, probably will not have the money the proponents claim to have set aside to meet the inflation plus one percent obligation," and it urged the voters to reject the amendment "simply because of its complexities." The release noted that "drunken sailors and marines [will] have acted like cub scouts ... compared to many legislators when they have TABOR exempt tax dollars to spend."

Common Cause filed a complaint with the Secretary of State, alleging that, in issuing the press releases and related media pieces, the Treasurer had violated the prohibitions of the FCPA against using state resources to express opposition to a state-wide ballot issue. Pursuant to § 1–45–111, C.R.S.2002, an ALJ was appointed to hear the matter.

In their case management order, the parties stipulated to most of the facts and agreed that two issues were presented:

1) Whether Treasurer Mike Coffman was authorized—constitutionally, statutorily or by the common law—to use state resources, in part through the use of emails, faxes, web postings and press releases, to express an opinion regarding Amendment 23, and, therefore, whether the Treasurer and his staff were allowed to generate and disseminate the statements at issue, such that there was no violation of Section 117 of the Colorado Fair Campaign Practices Act, § 1–45–117, C.R.S.2000?

2) If Treasurer Mike Coffman was not so authorized, did his actions constitute a violation of Section 117 of the Fair Campaign Practices Act, or were his actions, nevertheless, exempt pursuant to § 1–45–117(1)(a)(II), C.R.S.2000?

On the parties' cross-motions for summary judgment, the ALJ determined that there were no genuine issues of material fact as to the first issue and that, as a matter of law, the Treasurer was not authorized to use public resources exceeding fifty dollars to urge the electorate to vote against proposed Amendment 23. The ALJ determined, however, that genuine issues remained as to whether the Treasurer had expended more than fifty dollars of public funds under § 1–45–117(1)(a)(II), C.R.S.2002, and also as to whether the Treasurer's actions were permitted under § 1–45–117(1)(b)(III)(A) and (B), C.R.S.2002.

Following a hearing on June 5, 2002, the ALJ entered findings of fact and conclusions of law determining that (1) that the Treasur-

er used more than fifty dollars of public funds in opposing Amendment 23; and (2) the Treasurer's conduct was not made permissible by § 1–45–117(b)(1)(III)(A) and (B). Concluding that he lacked jurisdiction to impose a criminal penalty, the ALJ imposed a civil penalty of $334.92 on the Treasurer, individually. This appeal followed.

## I.

▮ In this appeal, we are asked to interpret portions of the FCPA. Our review of a statutory interpretation is de novo. *Fowler Irrevocable Trust 1992–1 v. City of Boulder,* 17 P.3d 797 (Colo.2001).

An ALJ's findings of evidentiary fact may not be set aside on review unless they are contrary to the weight of the evidence. Section 24–4–105(1)(b), C.R.S.2002; *Colo. State Bd. of Nursing v. Lang,* 842 P.2d 1383 (Colo. App.1992).

▮ Findings of ultimate fact are conclusions of law or mixed questions of fact and law. A finding of ultimate fact may be set aside only if the substituted conclusions have a reasonable basis in law and are supported by substantial evidence. *Davis v. State Bd. of Psychologist Exam'rs,* 791 P.2d 1198 (Colo.App.1989).

## II.

▮ The Treasurer contends that the ALJ erred in concluding, as a matter of law that the Treasurer lacked authority to use state resources to inform citizens about the fiscal impact of the passage of a proposed constitutional amendment and to urge its defeat. We do not agree.

The purpose of § 1–45–117 is to prohibit the state government and its officials from spending public funds to influence the outcome of campaigns for political office or ballot issues. *See* Hearings on H.B. 1179 before the House Committee on State Affairs, 56th General Assembly, 2d Session (Feb. 11, 1988)(discussing predecessor statute to § 1–45–117, 1988 Colo. Sess. Laws, ch. 33, § 1–45–116(1)(a) at 301); Hearings on H.B. 95–1017 before the House Committee on State, Veterans and Military Affairs, 60th General Assembly, 1st Session (1995).

▮ In construing a statute and determining legislative intent, we rely on the language of the statute and give the words used their plain and ordinary meaning. Section 2–4–101, C.R.S.2002; *Hall v. Walter,* 969 P.2d 224 (Colo.1998). If the meaning of a statute is clear and unambiguous, then we need not resort to other aids of statutory construction to ascertain the intent of the General Assembly. However, if the statutory language is ambiguous, a reviewing court may consider legislative history and other extrinsic sources to assist in ascertaining its meaning. *Colo. Dep't of Revenue v. Woodmen of the World,* 919 P.2d 806 (Colo.1996). Additionally, in order to effectuate legislative intent, we consider statutes as a whole and attempt to give consistent, harmonious, and sensible effect to all their parts. *State v. Nieto,* 993 P.2d 493, 501 (Colo.2000).

▮ "Furthermore, when possible, statutes should be construed so as to avoid questions of their constitutional validity." *Adams County Sch. Dist. No. 50 v. Heimer,* 919 P.2d 786, 790 (Colo.1996), citing *People v. Thomas,* 867 P.2d 880, 883 (Colo.1994); and *Perry Park Water & Sanitation Dist. v. Cordillera Corp.,* 818 P.2d 728, 732 (Colo.1991).

We will consider each of the pertinent subsections of the statute here.

## A.

Section 1–45–117(1) provides the spending prohibition and certain exceptions, in pertinent part:

(a)(I) No ... department ... of the state ... shall ... expend any public moneys from any source, or make any contributions, to urge electors to vote in favor of or against any:

(A) state-wide ballot issue that has been submitted for the purpose of having a title designated and fixed pursuant to section 1–40–106(1) or that has had a title designated and fixed pursuant to that section ....

(II) ... A member or employee of any such ... department ... who has policy-making responsibilities may expend not more than fifty dollars of public moneys in

the form of letters, telephone calls, or other activities incidental to expressing his or her opinion on any such issue described in subparagraph(I) of this paragraph (a).

(1)(b)(I) Nothing in this subsection (1) shall be construed as prohibiting ... [a] department ... from expending public moneys ... to dispense a factual summary, which shall include arguments both for and against the proposal, on any issue of official concern before the electorate in the jurisdiction. Such summary shall not contain a conclusion or opinion in favor of or against any particular issue....

Thus, § 1–45–117(1)(a)(II) allows a state official or employee with policy-making responsibilities to expend up to fifty dollars in expressing opinions on campaign and ballot issues. However, the Treasurer does not challenge on appeal the ALJ's finding the Treasurer expended more than fifty dollars in holding the press conference and issuing press releases.

Further, even if under § 1–45–117(1)(b)(I) the ballot issue were "an issue of official concern" as to which the Treasurer could properly use public funds to issue a factual summary of the arguments in favor of and against the proposed amendment, the Treasurer's press releases are not such a balanced factual summary but, instead, constitute "a conclusion or opinion ... against" the ballot proposal. As such, they remain subject to the spending limitations of the statute.

### B.

The statute also permits state officials such as the Treasurer to express personal opinions in favor of or against election candidates and ballot proposals. It provides: "Nothing in this subsection (1) shall be construed to prevent an elected official from expressing a personal opinion on any issue." Section 1–45–117(1)(b)(II), C.R.S.2002. The statute does not, however, authorize the expenditure of public funds for the expression of such personal opinions. In any event, the Treasurer does not maintain here that his actions involved the mere expression of personal opinions.

Rather, he argues that his press releases on Amendment 23 were resolutions or positions of advocacy and that, under § 1–45–117(1)(b)(III), C.R.S.2002, the statutory spending limitations therefore do not apply. That subsection provides, in pertinent part:

Nothing in this subsection (1) shall be construed as prohibiting ... [a] department ... of the state ... from:

(A) passing a resolution or taking a position of advocacy on any issue described in subparagraph (I) of paragraph (a) of this subsection (1); or

(B) Reporting the passage of or distributing such resolution through established, customary means, other than paid advertising, by which information about other proceedings of such ... department ... is regularly provided to the public.

First, we reject the Treasurer's assertion that his press conference, press releases, and other actions in opposition to the proposed Amendment 23 constituted the passing of a resolution. A resolution is "[a] formal expression of the opinion or will of an official body or public assembly, adopted by vote; as a legislative resolution." *Black's Law Dictionary* 1178 (5th ed.1979). Thus, a resolution generally requires action by a voting body.

We also reject the Treasurer's assertion that his actions constituted the taking of a position of advocacy on the ballot measure and that therefore the spending limitation of the FCPA does not apply and his actions were proper.

Section 1–45–117(1)(b)(III) does not authorize unlimited expenditures in taking positions of advocacy—it merely clarifies that the FCPA is not to be construed to prohibit a department from taking such positions. This section does not purport to create an exception to the spending limitations of the FCPA.

The Treasurer's interpretation of the statute—as creating an exemption from the spending limitation for any taking of a position of advocacy—would totally undermine the stated purposes of FCPA. Under that interpretation, a government official who spent state funds in opposing a candidate or ballot measure would, by definition, be taking

a position of advocacy on an issue and therefore be unconstrained by the spending limits. Such a construction would render other provisions of the FCPA meaningless. Because such an interpretation would lead·to that absurd result, we reject it. *See State v. Nieto, supra* (courts must reject interpretations that lead to absurd results).

Accordingly, under the circumstances here, the ALJ did not err in finding that· the Treasurer violated the FCPA by expending more than fifty dollars of public funds in urging voters to defeat Amendment 23.

■ Finally, we disagree with the Treasurer that the ALJ had no authority to impose a monetary sanction for his violation of $ 1-45-117.

The former § 1-45-111 authorized an ALJ to impose an appropriate sanction for a violation of several sections of the statute, including § 1-45-117. Colo. Sess. Laws 2000, ch. 36 at 127 (repealed effective Dec. 6, 2002); *cf.* Colo. Const. art. XXVIII, § 9. The former § 1-45-113(1) set forth that a violation of any of the enumerated sections, including § 1-45-117, constitutes a class two misdemeanor. It further provided:

> In addition to the criminal penalty provided for in subsection (1) of this section, any person who intentionally violates any provision of this article relating to contribution limits shall be subject to a civil penalty of double the amount contributed or received in violation of the applicable provision of this article.

Colo. Sess. Laws 2000, ch. 36, § 1-45-113(2) at 128 (repealed effective Dec. 6, 2002); *cf.* Colo. Const. art. XXVIII, § 10.

The Treasurer argues that he did not violate any provision "relating to contribution limits" and, therefore, the ALJ had no authority to impose a fine against him. However, read in context, the term "contribution limits" as used in § 1-45-113 included, as relevant here, the statutory restrictions on the expenditure of public money. To the extent that the General Assembly added a provision explicitly stating that any violation of § 1-45-117 was subject to sanctions under § 1-45-113, we read this as a clarification rather than, as· the Treasurer ·argues, a change in the law.· *See* § 1-45-117(4), C.R.S. 2002; *Corsentino v. Cordova,* 4 P.3d 1082 (Colo. 2000)(if amendment clarifies the law, then law remains unchanged).

Based on our resolution of this case, we deem it unnecessary to consider the Treasurer's other contentions.

The order is affirmed.

Judge DAVIDSON and Judge KAPELKE concur.