Mike COFFMAN, Colorado State
Treasurer, Petitioner,

v.

COLORADO COMMON CAUSE, a regis-
tered not-for-profit corporation; and
Pete Maysmith, Executive Director of
Colorado Common Cause, Respondents.

No. 03SC397.

Supreme Court of Colorado,
En Banc.

Dec. 6, 2004.

Ken Salazar, Attorney General, Maurice G. Knaizer, Deputy Attorney General, Public Officials Unit, State Services, Denver, for Petitioner.

The Overton Law Firm, Richard J. Gleason, Denver, for Respondents.

KOURLIS, Justice.

Mike Coffman, Treasurer of the ·State of Colorado, challenges the court of appeals' decision in *Colorado Common Cause v. Coffman*, 85 P.3d 551 (Colo.App.2003), in which the court upheld an Administrative Law Judge's (the "ALJ") determination that during the November 2000 election, Treasurer Coffman violated the Fair Campaign Practices Act (the "FCPA"), section 1–45–101 *et seq.*, C.R.S. (2004), by the issuance of three press releases. The FCPA broadly prohibits public agencies and employees from using public monies to support or oppose election measures, except as otherwise exempted.

A state-wide ballot initiative concerning school funding was proposed for the November 2000 election. Prior to the election, Treasurer Coffman issued three press releases opposing the amendment and advocating its defeat. Following the election, Colorado Common Cause ("Common Cause") filed its complaint with the Secretary of State, alleging that Treasurer Coffman had violated the FCPA. The Secretary of State assigned the case to an Administrative Law Judge. The Treasurer supported his actions by reference to his constitutional and statutory duties as treasurer of the state to protect the State's economic health and solvency. Alternatively, he argued that his activities were covered by exemptions within the FCPA. The ALJ found a violation of the FCPA and on appeal, the court of appeals agreed, opining that the Treasurer had no independent authority to

issue the releases free from the FCPA constraints, and that the FCPA does not permit unlimited expenditure of public funds for the purpose of expressing an unbalanced position on a ballot measure.

We granted certiorari to determine whether Treasurer Coffman's pre-election press releases were authorized by the state constitution and statutes governing the office of treasurer, or were otherwise permitted by the FCPA. We now hold that even though the Treasurer is an elected official charged with responsibility for the state coffers and implicitly imbued with leadership responsibilities in that regard, nothing in the constitution or statutes permits him to avoid the constraints of the FCPA with respect to the expenditure of state funds to advocate either for or against a ballot measure pending before the electorate. Concluding that the FCPA is applicable, we further conclude that none of its exemptions immunize the press releases from the limitations of the Act. The ALJ's findings of fact were supported by competent evidence in the record, and we thus hold that the three press releases issued by Treasurer Coffman exceeded the FCPA's fifty-dollar limitation.

Accordingly, since we determine that Treasurer Coffman was bound by the FCPA and that the issuance of the releases made use of resources in excess of the fifty-dollar exemption, we affirm the court of appeals.

## I. FACTS

### A. BACKGROUND

On November 7, 2000, Colorado voters approved Amendment 23, a state-wide ballot initiative concerning monies appropriated for public school funding. Following the election, Common Cause and its executive director, Pete Maysmith, filed a complaint against Treasurer Coffman alleging the illegality of three pre-election press releases

issued by the state treasurer in opposition to the amendment.

Common Cause is a citizen's advocacy group headquartered in Denver, Colorado; Maysmith is a Colorado resident as well (collectively "Common Cause"). Mike Coffman was elected state treasurer in 1998, and remains in that capacity.

Amendment 23 proposed an amendment to the Colorado Constitution creating the "State Education Fund." The measure provided, among other things, that one third of one percent of income tax be set aside each fiscal year for the State Education Fund. The fund was to be administered by the State Treasurer and exempted from fiscal year spending limitations.[1] The Amendment passed in the November, 2000 general election.

Prior to the election, Treasurer Coffman issued three press releases opposing the amendment.[2] The first press release was dated September 7, 2000 and titled "Coffman: Amendment 23 a 'Fiscal Train Wreck.'" The release warned of the dire consequences of voter approval. Treasurer Coffman based his opposition to the amendment on several grounds, including his concern that:

> If Colorado voters approve Amendment 23 this November the new State Education Fund it creates will ensure a fiscal "train wreck" for the state when the economy inevitably cools down .... This terribly confusing and complex initiative ... promises nothing in return for a huge increase in spending. I don't think the authors of this initiative fully considered the effects of their amendment when they wrote it.

Although this first press release did not specifically urge voters to defeat the amendment, it did conclude with the treasurer's admonishment that proponents should "tell the taxpayers of Colorado what other important programs the legislature must cut to support the hundreds of millions in new spending that it mandates."

---

1. Limitations on fiscal year spending are found in Colo. Const. art. X, § 20.

2. Two additional activities by the Treasurer are referenced in the record but do not form part of the issues in this case. These are: a September 7 press conference held by Treasurer Coffman in

which he opposed the Amendment; and a fourth press release or "Treasur–E–Note" titled "Coffman Warns Legislators on Amendment 23," dated December 6, and faxed to members of the media.

The Treasurer's second and third press releases were likewise critical of the amendment, but unlike the first, these specifically advised voters to defeat Amendment 23. The second titled, "Amendment 23 Technically Flawed," was dated October 17, 2000 and warned that passage of the amendment would "force Colorado to slash about $350 million of highway funding and new capital construction projects." Treasurer Coffman attributed such dramatic cuts in "critical expenditures" to "a technical error made by the amendment's drafters," resulting from the timing of the effective date of the amendment. He declared that "[t]he carelessly written amendment is so deeply flawed that I urge Colorado's voters to turn it down."

The third release, dated October 25, 2000 and titled, "Amendment 23 Deceptive," suggested that proponents had used "incomplete and misleading statements" to support the proposal. The Treasurer remarked that "what they say it will do is not exactly what it will do." Treasurer Coffman analogized Amendment 23 to a drunken sailor's intemperate spending spree:

> I spent a year out at sea, in the Marine Corps. I remember port visits on paydays with drunken sailors and Marines on spending sprees. Now that I look back on it, they acted like cub scouts at a church picnic compared to many legislators when they have TABOR exempt tax dollars available to spend ... when an economic downturn occurs the State Education Fund, like a sailor's wallet on the morning after, probably will not have the money the proponents claim to have set aside to meet the inflation plus one percent obligation.

Treasurer Coffman concluded by urging voters to "turn down Amendment 23."

All three releases were printed on Department of Treasury letterhead and designated "News Release." Each listed Steven Roalstad, a member of the department staff, as the contact person.

---

3. § 1–45–111(2)(a), 1 C.R.S. (2001) (repealed by Colo. Const. art. XXVIII, § 9, 2003 Colo. Sess. Laws, 3597).

4. Pursuant to section 1–45–111, *supra* note 3.

## B. PROCEDURAL HISTORY

### 1. Administrative Proceeding

On February 12, 2001, Common Cause filed its complaint with the Secretary of State,[3] alleging that Treasurer Coffman and the treasurer's office used public resources to formulate and distribute the three press releases to members of the public and the media, to wit: faxing the releases to various media outlets (and possibly individuals) from the treasurer's office; using state equipment and telephone lines; posting the releases on the official State of Colorado website for the State Treasurer's office; posting the press release dated September 7, on the website with a link to a Denver Post editorial critical of the amendment; and distributing email communications, denominated "Treasur–E–Notes," which opposed the passage of the amendment.

The Secretary of State assigned the case to an ALJ to conduct a hearing.[4] The ALJ scheduled a hearing for June 5 and 6, 2001. On March 21, the parties filed a case management order in which they set forth a number of stipulated facts. The parties stipulated that the press releases had been faxed to members of the media and posted on the department's website and in addition: (1) copies of the first release had been distributed by the treasurer to members of the media at a press conference he conducted; (2) at least one press release was faxed outside of Colorado; (3) in accordance with Treasurer Mike Coffman's request, Deputy Treasurer Ben Stein researched Amendment 23 and its financial impact; (4) in accordance with Treasurer Mike Coffman's request, Deputy Treasurer Ben Stein and Executive Assistant Steve Roalstad assisted in the drafting of each press release and each Treasur–E–Note.[5]

The case management order provided, in addition, that there were two primary issues in dispute:

---

5. The press releases and "Treasur–E–Notes" are for the most part the same documents. The Treasur–E–Notes are the press releases formatted for emailing. For purposes of convenience, we use the term "press release" throughout this opinion.

(1) Whether Treasurer Mike Coffman was authorized—constitutionally, statutorily or by the common law—to use state resources, in part through the use of e-mails, faxes, web postings and press releases, to express an opinion regarding Amendment 23, and, therefore whether the Treasurer and his staff were allowed to generate and disseminate the statements at issue, such that there was no violation of Section 117 of the Colorado Fair Campaign Practices Act . . . .

(2) If Treasurer Mike Coffman was not so authorized, did his actions constitute a violation of Section 117 of the Fair Campaign Practices Act, or were his actions nevertheless exempt . . . ?

Both sides agreed that if the Administrative Law Judge answered the first question in the negative, the matter would proceed to a hearing on the second issue.

On April 19, 2001, the parties filed cross-motions for summary judgment. Common Cause moved for summary judgment on the first issue only, and the ALJ limited the Treasurer's motion to that issue as well. On May 7, 2001, the ALJ issued an order granting in part and denying in part Common Cause's motion for summary judgment and denying Treasurer Coffman's motion. The ALJ noted the absence of any genuine issues of material fact and concluded as a matter of law that "the Treasurer has not shown an independent basis to issue the press releases in question."[6] Accordingly, the ALJ left unresolved the question of whether the Treasurer's activities were exempt from the FCPA's prohibitions against contribution of public resources towards campaign activity.

On June 5, 2001, the ALJ conducted a hearing on the matter of whether the press releases met the FCPA's "fifty dollar exception," or its "resolution or position of advocacy exception." The ALJ heard testimony from Treasurer Coffman, Deputy Treasurer Ben Stein, and Executive Assistant Steven Roalstad, and expressly incorporated their testimony in the final order.

Although the thrust of the hearing concerned the question of whether the Treasurer's press releases were protected by the FCPA's exemptions, evidence emerged, through Treasurer Coffman's own statements, that the Legislative Council of the Colorado General Assembly had published and distributed an analysis of the 2000 ballot proposals ("Blue Book") to the public. The Treasurer acknowledged that the Blue Book included both arguments for and against Amendment 23. He stated, however, that the Blue Book analysis was riddled with inaccuracies; he consequently considered it his duty, as state treasurer, to inform the public of the true ramifications of Amendment 23.

In a lengthy order designating Findings of Facts and Conclusions of Law, the ALJ determined that Treasurer Coffman's activities were not protected by either of the relevant FCPA exemptions. Hence, the ALJ turned to whether public funds expended by Treasurer Coffman to generate and distribute the three press releases exceeded the FCPA's fifty-dollar cap. In that regard, the ALJ took into account evidence that Stein and Roalstad had prepared all three releases during regular working hours under the Treasurer's direction, and that Roalstad posted the releases on the department's website and formatted them for emailing during working hours as well. The ALJ concluded that public funds totaling over three hundred dollars were expended in Stein's and Roalstad's salaries and to cover copying and faxing expenses. The ALJ rejected Treasurer Coffman's contention that Common Cause had the burden of demonstrating what portion of the amount should have been regarded as exempt from calculation as internal communication by the department. In the ALJ's view, the releases were not internal government memoranda, but were used to communicate the Treasurer's views against the amendment to the public. Although the ALJ acknowledged that "any time a state agency prepares a press release there will be an ancillary effect of informing and educating some agency personnel," he concluded that such "effect does not permit expenditure of

6. Although the ALJ granted Common Cause's motion in part and denied it in part, the language of the order indicates that the motion was actually granted in its entirety because Common Cause requested summary judgment on the first issue only.

public money to oppose state-wide ballot issues." The ALJ concluded that to hold otherwise would permit government officials to "end-run" the FCPA. Thus, the ALJ concluded that staff time was properly included for the purpose of calculating the fifty-dollar cap.

The ALJ determined, also, that Treasurer Coffman's activities were not protected by the FCPA's "resolution or advocacy exception," because the challenged press releases were published by the Treasurer. The ALJ reasoned that the statute does not provide for the publication of "positions of advocacy." In addition, the ALJ concluded that the three press releases did not constitute "resolutions." Finding the plain meaning of "resolution" to be limited to decisions "by an official body or public assembly," the ALJ concluded that "mere statements by the Treasurer are not 'resolutions.'" The ALJ lastly found that the Treasurer was "responsible" for expenditure of funds in excess of fifty dollars and accordingly, the ALJ granted Common Cause's prayer for relief and imposed a civil penalty.

### 2. Court of Appeals Opinion

On September 10, 2001, Treasurer Coffman appealed from the decision of the ALJ to the court of appeals.[7] That court upheld the ALJ's pronouncements in *Colorado Common Cause v. Coffman*, 85 P.3d 551 (Colo. App.2003). The court of appeals addressed the FCPA in its entirety, including sections not contested by the Treasurer. It opined that the statute did not permit a state official or employee with policy-making responsibilities to expend more than fifty dollars in expressing opinions on campaign and ballot issues. *Id.* at 555. Addressing the FCPA's "factual summary" exception, the court of appeals concluded that even if Amendment 23 could be considered an "issue of official concern" the statute required that the Treasurer render a balanced portrayal of Amendment 23. *Id.* It observed that "the Treasurer's press releases are not such a balanced factual summary but, instead, constitute a

'conclusion of opinion ... against' the ballot proposal." *Id.* Since the Treasurer had not contested the ALJ's factual finding that his expenditures exceeded the fifty-dollar limit, and since it concluded that the press releases remained subject to the FCPA's limits, the court upheld the ALJ's order. *Id.*

The court also held that although the FCPA offers an exemption for opinions on ballot measures by elected officials, the statute did not permit the expenditure of public funds for the expression of such personal opinion. It noted, again, that the Treasurer had not suggested that his activities were protected by the "elected official" exception. *Id.*

Turning to the statutory exemptions advanced by Treasurer Coffman in support of his campaign activities, the court of appeals dismissed the Treasurer's contention that the three press releases were insulated from the FCPA's prohibitions by the "resolution or positions of advocacy exemption." *Id.* at 555–56. The court concluded that the press releases were not "resolutions" because "a resolution generally requires action by a voting body." *Id.* at 555. Likewise, the court of appeals rejected Treasurer Coffman's assertion that his press releases constituted a "position of advocacy" under the FCPA. *Id.* In the court's view, while the exemption clarifies that a department may take a position of advocacy on a ballot measure, it does not permit unlimited expenditure of public funds in taking such position of advocacy. *Id.* The court reasoned that to interpret the statute as permitting such unlimited expenditure of public funds would render the FCPA's overall prohibitions meaningless.[8] *Id.* at 556.

We granted certiorari to determine whether Treasurer Coffman's official duties as state treasurer, as defined by the state constitution and various statutes, permit unlimited expenditure of public funds in advocating defeat of a ballot initiative proposed for voter consideration. If not, we are asked to determine whether the pre-election press releases issued by the treasurer comply with, or are

---

7. Pursuant to section 1–45–111, *supra* note 4.

8. The court of appeals also dismissed the Treasurer's contention that the ALJ had no authority

to impose civil penalties for violation of the FCPA. That issue is not before this court.

otherwise exempt from the FCPA. We now hold that neither the constitution nor statutes governing the official duties of state treasurer permit unlimited expenditure of public funds in advocating for or against a ballot measure. Accordingly, the Treasurer's authority to generate and distribute press releases advocating the defeat of any ballot measure must be found within the ambit of the FCPA. We hold that the three press releases at issue violated the FCPA and are not protected by any applicable exemption.

## II. ANALYSIS

### A. DECIDING ISSUES OF STATE CAMPAIGN FINANCE VIOLATIONS ON STATUTORY GROUNDS

Treasurer Coffman is an elected leader of the State of Colorado. In that vein, he argues that he has specific constitutional and statutory responsibilities that both permit and demand that he take leadership positions on financial issues.

▓ We, for our part, however, must approach those arguments with great caution. When resolving issues concerning unlawful expenditure of public resources to fund campaign activity, we must look first to the applicable statutes and not venture into far-reaching constitutional issues concerning government speech unless necessary. *See* Mark G. Yudof, *When Governments Speak: Toward a Theory of Government Expression and the First Amendment,* 57 Tex. L.Rev. 863, 912–913 (1979). We have cautioned that constitutional questions that are not essential to the resolution of issues before us should not be addressed. *Town of Orchard City v. Bd. Of Delta County Comm'rs,* 751 P.2d 1003, 1006 (Colo.1988). Similarly, other state courts generally view the issue as "one of statutory construction, that is, whether a particular expenditure is within or without legislative authorization." *See Burt v. Blumenauer,* 299 Or. 55, 699 P.2d 168, 177 (1985). Thus, even being cognizant of the Treasurer's arguments, we do not view the issue as one of "government speech" or the right of public officials to speak freely on matters of public concern. Treasurer Coff-

man has the right, and perhaps the duty, to speak out on matters of concern to his office or to the electorate. However, what we deal with today is what the applicable statutes provide with respect to constraints on those efforts.

▓ It is axiomatic that we look to the language of the statute to determine legislative intent. *State v. Nieto,* 993 P.2d 493, 500 (Colo.2000). We do not resort to extrinsic modes of statutory construction unless the statutory language is ambiguous. *Dept. of Revenue v. Woodmen of the World,* 919 P.2d 806, 817 (Colo.1996). In construing a statute, we will adopt a construction that will serve the legislative purposes underlying the enactment. *Id.* at 810.

▓ Moreover, we must give particular deference to the reasonable interpretations of the administrative agencies that are authorized to administer and enforce a particular statute. *Tivolino Teller House, Inc. v. Fagan,* 926 P.2d 1208, 1211 (Colo.1996). On review, an agency decision will be sustained unless arbitrary or capricious, section 24–4–106(7), C.R.S. (2004), or unsupported by the evidence or contrary to law, *Regents of the Univ. of Colorado v. Meyer,* 899 P.2d 316, 317 (Colo.App.1995). However, although we find persuasive an administrative interpretation of statute that is a reasonable construction consistent with public policy, *Aurora v. Bd. of County Comm'rs,* 919 P.2d 198, 203 (Colo.1996), it is for this court to determine all questions of law, interpret applicable statutes, and apply such interpretations to the facts, *Meyer, supra.* Likewise, even though an agency construction of statute should be given appropriate deference, its interpretation is not binding on this court. *See El Paso County Bd. of Equalization v. Craddock,* 850 P.2d 702, 704 (Colo.1993).

### B. THE TREASURER'S OFFICIAL DUTY AS PERMITTING EXPENDITURE OF PUBLIC FUNDS

▓ The Treasurer argues that he legitimately used public resources to create the press releases in performance of his official duties. He posits that his duties as treasurer, as defined by the state constitution and

various statutes, include both monitoring Colorado's fiscal condition, and serving a fiduciary role, which entail informing the public on matters affecting the state coffers. For this latter proposition, he points to the constitution and various statutes requiring or authorizing the state treasurer to file reports.

Indeed, the statutes do broadly describe the duties of state treasurer to encompass fiscal monitoring responsibilities. The state treasurer has the duty to "keep adequate records of all monies coming into his custody," and "at the end of each quarter of the fiscal year submit a written report to the governor ... showing the condition of the state treasury ...." § 24–11–107(6), 7B C.R.S. (2002) (repealed 2003). The governor is authorized to cause the Treasurer's quarterly report to be promptly published in at least one newspaper. *See* Colo. Const. art. X, § 12(3); § 24–22–107(1). Accordingly, the Treasurer's reporting function primarily relates to his role in keeping the governor informed. He has no explicit fiduciary role that entails reporting such matters to the public. On the other hand, he is the constitutional custodian of public monies that have been entrusted to his care. *See generally In re House Resolution,* 12 Colo. 395, 21 P. 486 (1889).

The statutes permit the Treasurer to "issue publications circulated in quantity outside the executive branch of state government in accordance with the provisions of section 24–1–136." § 24–22–107(4). Section 24–1–136, the "Information Coordination Act," guides heads of departments in formulating operational reports and publications related to agency functions. It subjects the publication of such reports to the governor's approval. § 24–1–136(3)(b)(II). Department publications are circulated outside the executive branch by delivery to the state librarian, section 24–1–136(3)(e), to the general assembly, section 24–1–136(9), or sold to the public by an agency having appropriations for producing publications to be sold to the public, or otherwise having approval of the controller prior to making any disbursements for said publications, section 24–1–106(10).

All indications are that the constitution and statute require the Treasurer to make operational and administrative reports detailing annual objectives set forth in budget requests, bringing to the governor's attention special problems affecting the department, or collecting and from time to time publishing certain regular or special reports the governor or the general assembly may require. *See* § 24–1–136(3)(b)–(f) & (4). These duties are not unique to the office of treasurer, however; heads of principal departments jointly fulfill the responsibilities of coordination and control of administrative information. § 24–1–136(3).

In sum, neither the constitution nor the statutes delineating the duties of Treasurer Coffman demand that he keep the public apprised of the status of the state's coffers through regular reports. The statutes outline specific circumstances whereby such reports may be issued to the governor, and subsequently disbursed to the public. Even assuming, however, that his general fiduciary responsibilities would suggest such a course of action, nothing in the statutes or constitution deal with his authority to distribute information advocating support or opposition to a pending ballot measure—even if the measure concerns fiscal matters. No statutory or constitutional provision supercedes the FCPA in that regard, and therefore, we must look to the terms of the FCPA itself.

## C. THE FCPA's RESTRICTION ON CONTRIBUTIONS OF PUBLIC RESOURCES TOWARDS CAMPAIGN ACTIVITY

### 1. Umbrella Restriction

The FCPA was first enacted in 1974 under the title "Campaign Reform Act." Ch. 57, sec. 1, § 49–27–116, 1974 Colo. Sess. Laws 261, 268–71. At the time, the expressed purpose of the pertinent provision was to prevent state or political subdivisions from devoting public resources toward persuading voters during an election. Hearing on Senate Bill 28, Senate State Affairs Committee, Colorado General Assembly Second Regular Session (1974).

The statute has been amended, repealed, and reenacted several times since its inception, but its core premise has remained unchanged. As currently codified, *see* § 1–45–101 *et seq.,* C.R.S. (2004), the FCPA seeks to control campaign contributions by individual contributors and special interest groups. *See* § 1–45–102. More pertinently here, it regulates expenditure of public monies by state agencies, departments, officials, and employees to prevent the state machinery from thwarting the electoral process. *See generally* § 1–45–117.

As relevant here, the umbrella restriction prevents state agencies and departments from spending "public moneys from any source," or making "any contributions, to urge electors to vote in favor of or against any State-wide ballot issue" that has been submitted for voter approval. § 1–45–117(1)(a)(I)(A).[9] The statute anticipates that any spending of public monies to urge the public to vote for or against a ballot measure violates its strictures, unless such contribution is protected by one of several exemptions.

#### 2. Exemptions from the FCPA's Umbrella Restriction

The section (1)(a) or "fifty dollar" exemption was adopted in 1988. *See* ch. 33, sec. 1, § 1–45–116(1), 1988 Colo. Sess. Laws, 301. It permits a member or employee of any state agency or department with "policy-making" responsibilities to expend up to fifty dollars of public monies "in the form of letters, telephone calls, or other activities incidental to expressing his or her opinion on any" state-wide ballot initiative. The statute does not define "policy-making responsibilities" or "incidental to." However, it appears clear from the Administrative Procedure Act that heads of principal departments are employees with policy-making responsibilities.

*See, e.g.,* § 24–1–136 (defining "policy functions of heads of departments").

The plain meaning of "incidental" includes matters "happening as a result of or in connection with something more important." *See* Webster's New World College Dictionary 682 (3rd ed.1996); *see also Meyer,* 899 P.2d at 318 (holding that "incidental to" has a broad meaning).

The general assembly envisioned that while employees with policy-making responsibilities may express personal opinions on ballot measures, unless otherwise provided by the statute, any expenditure of public funds by the official in favor of or against any state-wide ballot measure must remain within the fifty-dollar limit, regardless of the source of the public monies used to support such activity. The only "incidental" expenses by a public official that the general assembly expressly insulated from the fifty-dollar limitation are located in subsection (2) of the statute. The following are not included for purposes of calculating the fifty-dollar limitation: (1) official residence furnished or paid for by the state or political subdivision; (2) security officers required to accompany a candidate or the candidate's family; (3) publicly owned motor vehicles provided for the use of the Governor or chief executive of a political subdivision; (4) publicly owned aircraft. *See* § 1–45–117(2); *see also Colorado Taxpayers Union, Inc. v. Romer,* 750 F.Supp. 1041, 1045 (D.Colo.1990) (characterizing as incidental, state owned airplane, automobile, and security personnel used by Governor while urging voters to defeat a ballot measure).

Accordingly, the fifty-dollar limitation is intended to apply to any expression of opinion by a public official or agency, unless the plain meaning of the statute suggests the opposite. That dollar cap forms the foundation by which the general assembly's intent is gleaned from the remaining applicable ex-

---

9. Section 1–45–117(1)(a)(I)(A) provides pertinently:

No agency, department, board, division, bureau, commission, or council of the state or any political subdivision thereof shall make any contribution in campaigns involving the nomination, retention, or election of any person to any public office, nor shall any such

entity expend any public moneys from any source, or make any contributions, to urge electors to vote in favor of or against any:

(A) State-wide ballot issue that has been submitted for the purpose of having a title designated and fixed pursuant to section 1–40–106(1) or that has had a title designated and fixed pursuant to that section.

emptions. The general assembly excluded the "factual summary" exemption, subsection (1)(b)(I), from the fifty-dollar limitation, prefaced on the protection of the umbrella prohibition—preventing unlimited expenditure of public funds in advocating one side of an election issue. Although the Treasurer did not suggest that his press releases are "factual summaries," a discussion of this provision is enlightening because it exposes the painstaking procedure by which the general assembly sought to permit the state to inform the public on electoral matters without eviscerating the FCPA's core value. Under subsection 1(b)(I), a state agency may spend unlimited public funds to distribute a "factual summary," which must include "both arguments for and against the proposal," and concerning "any issue of official concern before the electorate in the jurisdiction," and "shall not contain a conclusion or opinion in favor of or against any particular issue."

Finally, the statute does not prevent the state agency or department from "passing a resolution or taking a position of advocacy" on a state-wide ballot issue, or "reporting the passage of or distributing such resolution through established, customary means, other than paid advertising. . . ." § 1–45–117(b)(III)(A) & (B). Foremost, the statute makes clear that only the passing of a resolution may be reported.

■■■ Moreover, a "resolution" is "a formal expression of an opinion, intention, or decision by an official body or assembly (esp. a legislature)." Black's Law Dictionary 1313 (7th ed.1999). The use of the term in other contexts indicates that "resolution" connotes actions by governing bodies, such as legislatures or administrative boards. *See, e.g.,* § 1–41–103(1)(c), C.R.S. (2004) (describing "an ordinance, resolution, or franchise passed by the legislative body of any local government . . ."); § 7–55–113, C.R.S. (2004) ("resolution adopted by its board of directors"); § 22–44–107, C.R.S. (2004) ("a resolution adopted by the board of education"); *but see* § 24–32–1703(11) & (12) (defining "induce-

ment resolution" as "a resolution," [or] ordinance . . . adopted by an "issuing authority" and defining "issuing authority" as "any entity or person" with certain specified authority). Thus, while the statute provides for the passing of a resolution and taking a position of advocacy, only a resolution, passed by the governing body, as such, may be reported and thereby exempted from the fifty-dollar limitation.[10] *See Lunsford v. West. States Life Ins.*, 908 P.2d 79, 84 (Colo.1995) (holding that "when the legislature speaks with exactitude, we must construe the statute to mean that the inclusion or specification of a particular set of conditions necessarily excludes others").

## D. AUTHORITY FROM OTHER JURISDICTIONS

### 1. Colorado Federal Judicial Authority

This case presents an issue of first impression for this court. We pause, however, to review decisions of the federal courts and other state courts to point out that our decision today comports with what has become an established principle strictly construing statutes regarding use of public funds to influence the outcome of elections.

The federal courts have addressed the FCPA in two cases, *Mountain States Legal Found. v. Denver Sch. Dist. # 1,* 459 F.Supp. 357 (D.Colo.1978), and *Campbell v. Joint Dist. 28–J.,* 704 F.2d 501 (10th Cir.1983). Although both cases involved an earlier version of the statute, the refrains echoed by both remain relevant for purposes of the issues presented here. Then, the pertinent provision permitted state agencies and political subdivisions to "make contributions or contributions in kind in campaigns involving only issues in which they have an official concern." *See Mountain States,* 459 F.Supp. at 360. In *Mountain States,* a state-wide ballot initiative proposed an amendment to the state constitution regulating the manner in which all state entities spend public funds.

---

10. The statute permits elected officials to express a personal opinion on any ballot or other measure pending before the electorate. *See* § 1–45–117(1)(b)(II). Because the Treasurer does not suggest that the press releases were protected by this provision, we only point out that even though the statute protects that right, it does not provide for an unlimited expenditure of public funds in service of that right.

*Id.* at 359. The Denver School Board District # 1 resolved to oppose the amendment, contending that the issue was one of "official concern." *Id.* The court rejected that argument, asserting that "a proposed amendment to the state constitution on a general election ballot is not" an issue of official concern for the school board. *Id.* The court observed that passage of the amendment would not only affect the conduct of the board's affairs, but would have an equal impact on "all other state and local governmental agencies in Colorado." *Id.* As such, the Board did not enjoy a special exemption and the court held that expenditure of public funds in this context must reflect a balanced portrayal of the ballot measure. *Id.* at 350. It cited a leading opinion of the California Supreme Court emphasizing the "uniform judicial reluctance to sanction the use of public funds for election campaigns," resting on "an implicit recognition that such expenditures raise potentially serious constitutional questions." *Id.* at 360. In 1983, the Tenth Circuit arrived at the same conclusions under similar circumstances. *See Campbell, supra.*

Following *Mountain States* and *Campbell,* the general assembly amended the statute to authorize state agencies, departments, and subdivisions to use unlimited public funds only when distributing "factual summaries" on issues of "official concern." *See* ch. 104, sec. 2, § 1–45–116, 1991 Colo. Sess. Laws 604, 605. Thus, as currently codified, the statute does not permit a state agency or official to issue a biased report on ballot measures merely because the proposal may be of "official concern" or may perhaps implicate the state official's statutory or constitutional duties.

Over a decade after *Mountain States,* the author of that opinion, Judge Richard Matsch, wrote the decision in *Romer.* There, the plaintiffs sought section 1983 relief contending that Governor Romer had unlawfully expended public resources to sway voters to defeat a ballot initiative. In rebuffing the plaintiffs' complaint, Judge Matsch declared:

> The fundamental flaw in the plaintiffs' contentions is the failure to distinguish between governmental interference with an initiative and opposition to it from persons occupying positions in government. There is a difference between the conduct of public officials in speaking out on controversial political issues and their use of governmental power to affect the election. Coercion is the core of power in government. Whether the coercion is applied directly through compulsory or prohibitory laws or indirectly through taxation and expenditure, the use of that power is limited by constitutional controls, including the First Amendment.

*Romer,* 750 F.Supp. at 1045. Judge Matsch explained that because "[t]he governor is a political personage," his "powers of persuasion are attributes of his personality as well as his position." *Id.* Accordingly, he opined that "[w]hen those personal powers are not linked to the levers of the coercive authority of the government [the Governor] heads, there is no governmental interference with the First Amendment rights of those opposing him on an issue." *Id.*

Although intrinsically persuasive, *Romer* is distinguishable on several grounds. As a section 1983 claim, the plaintiff's complaint did not trigger the FCPA and, thus, Judge Matsch did not need to struggle with the statutory language that controls our decision today. Indeed, Judge Matsch distinguished *Mountain States,* explaining that *Romer* was not an expenditure case. *Id.* at 1044. He pointed out that the state had been reimbursed, by the citizens group associated with the Governor's campaign against the amendment, for almost all the outlay involved. *Id.* In addition, he correctly differentiated the use of a state owned airplane, automobile, and security personnel as "incidental expenditures." *Id.* at 1045; *see also* § 1–45–117(2) (excluding same from the FCPA's prohibitions). Judge Matsch also characterized certain "out-of-pocket" costs incurred by the Governor as "incidental." *Id.* We do not have the same opportunity to dismiss Treasurer Coffman's expenditures as incidental, as minimal as they were, because we are governed by plain statutory language to the contrary. The FCPA makes clear that even any costs "incidental to" expressing an opinion on such measures must not exceed the

statutory limit. *See* § 1–45–117(1)(a)(II). On the other hand, to the extent that *Romer* advocates that the statute does not prevent an elected official from espousing any views on a pending ballot measure as long as the official does not employ the state machinery to influence the election, the statute clearly concurs. *See* § 1–45–117(1)(b)(II) (permitting an elected official to express personal opinion on any issue).

### 2. Other Jurisdictions

Most judicial authorities disapprove the use of public resources to promote partisan positions during elections. In fact, jurisdictions that have addressed the issue so far agree almost uniformly that during an election, communication from the state may inform but not attempt to sway the electorate.[11]

The New Jersey and California Supreme Courts issued the two leading opinions in this area. In an opinion written by Justice Brennan before his tenure on the United States Supreme Court, the New Jersey Supreme Court held as unlawful, election activities by a local school board urging voters to support a ballot measure. *See Citizens to Protect Pub. Funds v. Bd. of Edu.*, 13 N.J. 172, 98 A.2d 673 (1953). Prior to an election on a school construction-funding proposal, the board embarked on a campaign to sway voters to approve the bond measure. *Id.* at 674. Among other things, the board used public funds to print and distribute an 18–page booklet entitled "Read the Facts behind the … School Building Program." *Id.* Although most of the 18–page pamphlet contained factual summaries about the program, at least three pages exhorted voters to "Vote Yes!" and warned of the dire consequences for failure to approve the program. *Id.* The court rebuked the board for advocating "one side of the controversial question without affording the dissenters the opportunity by means of that financed medium to present their side and thus imperiled the propriety of the entire expenditure." *Id.* at 676. It declared that "[t]he public funds entrusted to the board belong equally to the proponents and opponents of the proposition, and the use of the funds to finance not the presentation of facts merely but also arguments to persuade the voters that only one side has merit, gives the dissenters just cause for complaint." *Id.*

In *Stanson v. Mott,* 17 Cal.3d 206, 130 Cal.Rptr. 697, 551 P.2d 1 (Cal.1976), the California Supreme Court was likewise skeptical of the selective use of public funds in an election campaign. The court held that "in the absence of clear and explicit legislative authorization, a public agency may not expend public funds to promote a partisan position in an election campaign." *Id.* at 211, 130 Cal.Rptr. 697, 551 P.2d 1. After evaluating cases from other jurisdictions, the court observed a "uniform judicial reluctance to sanction the use of public funds for election campaigns [resting on] an implicit recognition that such expenditures raise potentially serious constitutional questions." *Id.* As the court explained it, "[a] fundamental precept of this nation's democratic electoral process is that the government may not 'take sides' in election contests or bestow an unfair advantage on one of the several competing factions." *Id.; see also Smith v. Dorsey,* 599 So.2d 529, 542 (Miss.1992) (finding "compelling wisdom and sound logic in [the] line of cases which recognizes a balanced, information role in educating the local community about the referendum proposal"); *Palm Beach County v. Hudspeth,* 540 So.2d 147, 154 (Fla.Dist.Ct.App.1989) (observing that the theme which predominates the cases, simply stated, is that "while the county not only may but should allocate tax dollars to educate the electorate on the purpose and essential ramifications of referendum items, it must do so fairly and impartially"); *Stern*

---

11. *Citizens for Responsible Gov't v. City of Albany,* 56 Cal.App.4th 1199, 66 Cal.Rptr.2d 102 (1997); *Smith v. Dorsey,* 599 So.2d 529 (Miss. 1992); *Palm Beach County v. Hudspeth,* 540 So.2d 147 (Fla.Dist.Ct.App.1989); *Burt v. Blumenauer,* 299 Or. 55, 699 P.2d 168 (1985); *Godwin v. East Baton Rouge Parish Sch. Bd.,* 372 So.2d 1060 (La.Ct.App.1979); *Anderson v. City of Bos-* ton, 376 Mass. 178, 380 N.E.2d 628 (1979); *Stanson v. Mott,* 17 Cal.3d 206, 130 Cal.Rptr. 697, 551 P.2d 1 (Cal.1976); *Stern v. Kramarsky,* 84 Misc.2d 447, 375 N.Y.S.2d 235 (N.Y.Spe.Term.1975); *Citizens to Protect Pub. Funds v. Bd. of Edu.,* 13 N.J. 172, 98 A.2d 673 (1953).

*v. Kramarsky,* 84 Misc.2d 447, 375 N.Y.S.2d 235, 239 (N.Y. Spe. Term 1975) (cautioning that "it would be establishing a dangerous and untenable precedent to permit the government or any agency thereof, to use public funds to disseminate propaganda in favor of or against any issue or candidate"); *but see Quinn v. City of Tulsa,* 777 P.2d 1331, 1339 (Okla.1989) (acknowledging that there had been some impermissible expenditure of public funds to influence passage of a bond issue, but concluding that such activities "did not establish that the electoral process had been contaminated by these activities").

To be sure, the cases have distinguished between information and electioneering activities; and between lobbying another governmental body at a different level of government and lobbying one's own voters; *see Mott,* 17 Cal.3d at 218, 130 Cal.Rptr. 697, 551 P.2d 1, and between advocacy by governments themselves and advocacy by individual members of the government, *see Smith,* 599 So.2d at 541. The cases consistently hold, however, that "when public coffers are used to advocate only one side, with no opportunity for dissenters to present their side of the issue," the state has "overstep[ped] lawful and implied authority." *Id.*

Although we emphasize that any expenditure of public funds to advocate for or against any measure pending before the electorate must be justified by the statute, the cases from other jurisdictions illuminate the harm sought to be avoided by the statutory mandate.[12]

### E. THE VALIDITY OF THE TREASURER'S PRESS RELEASES UNDER THE FAIR CAMPAIGN PRACTICE ACT

The FCPA, section 1–45–117(1)(a)(I), provides that no state agencies or political subdi-

visions may make any contribution or expend any public monies from any source to persuade electors to vote for or against a state-wide ballot measure. The statutory section is entitled "State and political subdivisions—limitations on contributions."

As evidenced by the parties' trial management order, the Treasurer agrees that, prior to the election, he issued three press releases advocating the defeat of Amendment 23, a state-wide ballot measure. The ALJ found that there were $6.00 of copying costs associated with the press releases, and $11.00 for facsimile transmission charges. The ALJ further found that one member of Treasurer Coffman's staff spent three hours and thirty minutes generating and posting the releases, and another member of his staff spent six and one half hours. The ALJ divided the two individual's salaries by a fifty-hour week and arrived at an hourly rate, which he then calculated at $56.29 and $167.46 respectively for the two individuals. By the addition of the copying charges, the FAX charges and the hourly rate charges, the ALJ arrived at a sum of $334.92 expended by the Treasurer in opposition to Amendment 23. Taking into account the employees' hourly salary and the number of hours spent working on the releases, the ALJ concluded that the fifty-dollar statutory limit had been surpassed by the Treasurer.[13]

The Treasurer makes two legal arguments to support his contention that he did not violate the FCPA. First, he argues that even if the expenditures contravened the FCPA's umbrella restrictions, he is nonetheless immune from liability because the costs should not include staff time allocation, and therefore did not exceed the fifty-dollar limit. Alternatively, he urges that his press releases

---

12. We note that we need not address here what might constitute subtle advocacy under the guise of a balanced portrayal. The three press releases were clear and unmistakably opposed to the Amendment.

13. The ALJ properly excluded the Treasurer's salary in calculating the fifty-dollar limit. As previously noted, the statute permits elected officials to express personal opinion on measures pending before the electorate. *See* § 1–45–

117(1)(b)(II). The statute does not prevent the elected official from expressing such opinion during working hours. It, however, prevents him from using unlimited staff time in expressing that opinion. *See Romer,* 750 F.Supp. at 1044 (suggesting that state-paid staff time constitutes an expenditure if proven that the Governor's staff devoted time to campaign against ballot measures; but noting that as elected official, the Governor "has no duty shifts or time off").

constituted "resolutions" within the meaning of the statute.

### 1. Staff Time as Contributions in Kind

As we have noted, the FCPA expressly provides that "[n]othing in this subsection (1) shall be construed to prevent an elected official from expressing a personal opinion on any issue." § 1–45–117(1)(b)(II). Additionally, as an employee of the Treasury Department who clearly has policy-making responsibilities, Treasurer Coffman was entitled to "expend not more than fifty dollars of public monies in the form of letters, telephone calls, or other activities incidental to expressing his or her opinion on any such (ballot) issue." § 1–45–117(1)(a)(II).

The question is thus whether the FCPA's prohibition against the expenditure of public funds from any source, or making any contributions to urge electors to vote in favor of or against a ballot issue excludes or includes the calculation of staff time spent preparing or disseminating the press releases.

To answer that question, we must determine the meaning of contribution and expenditure for purposes of the statute. The definitions section of the statute in effect at the time of this election contains the following provisions:

"Contribution" is broadly defined as payment, loan, pledge or advance of money. § 1–45–103(4)(a), 1 C.R.S. (2000), currently codified at Colo. Const. art. XXVIII, § 2. It does not include "services provided without compensation by individuals volunteering their time on behalf of a[n] ... issue." § 1–45–103(4)(b). "Contribution in kind" is defined as:

[T]he fair market value of a gift or loan of any item of real or personal property, other than money, made to or for any candidate committee, issue committee, political committee, or political party for the purpose of influencing the passage or defeat of any issue .... Personal services are a contribution in kind by the person paying compensation therefore. In determining the value to be placed on contributions in

kind a reasonable estimate of fair market value shall be used.

§ 1–45–103(4.5)(a).

"Expenditure" is defined as:

[T]he payment, distribution, loan, or advance of any money by a candidate committee, political committee, issue committee or political party.... An expenditure occurs when the actual payment is made or when there is a contractual agreement and the amount is determined.

§ 1–45–103(6).

Did Treasurer Coffman make expenditures or contributions in excess of fifty dollars in connection with the press releases? First, the definition of FCPA's definition of expenditure is clearly limited to out-of-pocket expenditures. The definition itself is clear on that point. Accordingly, the Treasurer did not make expenditures in excess of fifty dollars.

Next, the definition of contribution includes the payment of money to a committee or campaign in support or opposition of an issue, and would not appear to apply. There is no outright contribution of money at issue here beyond the hard costs already identified. He did not make contributions in excess of fifty dollars.

Contribution in kind, on the other hand, covers the contribution of personal services—provided that the services are not volunteer services without pay. The statute provides that a contribution in kind is to be attributed to the person paying the compensation therefore and that the value is to be determined on the basis of fair market value of the services.

Looking to that language, the staff time Treasurer Coffman caused to be expended in opposing Amendment 23 falls within the purview of a contribution in kind. We note that he was not the payer for those services—the State of Colorado was, but he was certainly the supervisor and could direct staff time as he saw fit. There is evidence in the record regarding the hourly rate attributable to the individuals involved which is equivalent to the fair market value of the services. There is also evidence in the record that the services were provided as part of regular job

duties, were during work hours and were not volunteer services. Hence, Treasurer Coffman did contribute services in kind in excess of the fifty-dollar limit.

### 2. Press Releases as Resolutions

██ We agree with both the ALJ and the court of appeals in rejecting the Treasurer's legal argument that the press releases were "resolutions" exempted from the fifty-dollar limit. A resolution is the "formal expression of the opinion or will of an official body or public assembly adopted by vote." Black's Law Dictionary 1313 (7th ed.1999). The releases were Treasurer Coffman's opinion, not a formal position of the Treasury Department, were not adopted by vote, and contained persuasive argument in addition to a position statement. The general assembly clearly did not intend to classify the three press releases put out by Treasurer Coffman, a single decision-maker, as "resolutions." If we were to uphold the press releases as "resolutions," it would undermine the entire thrust of the legislative scheme—which we are obliged to give effect. For example, there would be no need to include the stricture that employees with policy-making responsibilities use not more than fifty-dollars to dispense personal opinions on ballot measures if department heads, such as the Treasurer, could expend unlimited public funds for the issuance of as many press releases as possible under the label "resolution."

### III. CONCLUSION

The statutory language of the FCPA unambiguously expresses the general assembly's intent to prevent state agencies and officials from using public funds to influence the outcome of an initiative election. To that end, the FCPA contemplates that when the public funds are used to inform the public about a pending ballot measure, the information provided must represent both sides of the issue. Treasurer Coffman opposed Amendment 23 as poor fiscal policy. He was entitled to take that position. However, he could not invoke the machinery of government to support that position—at least to an extent in excess of fifty dollars.

We affirm the court of appeals and hold that the Treasurer lacked independent authority to expend public resources in advocating the defeat of Amendment 23. We hold also that the three press releases issued by the Treasurer violated the FCPA and were not protected by any of its exemptions. Accordingly, we affirm the court of appeals.

Justice COATS dissents.

Justice COATS, dissenting.

Because I disagree with the majority's construction of the previous version of the Fair Campaign Practices Act, as well as its imposition of a fine on the Treasurer in this case; and because I fear that even though the FCPA has been substantially rewritten, the majority's construction will have a significant, deleterious impact on the public's right to be informed by its elected officials about the merits of pending ballot issues, I respectfully dissent.

Unlike the majority, I do not believe that the applicable version of section 117 proscribed contributions-in-kind, and even if it had, I do not believe that directing an elected official's staff to help him develop and articulate a policy position (especially one that involves matters of official concern to his office) could constitute a contribution-in-kind to an issue committee within the meaning of the Act. With regard to the imposition of civil penalties, both the ALJ and the majority plainly misinterpret, or simply ignore, the statute's reservation of such sanctions for those who intentionally violate the provisions of the Act. Finally, because I understand the authorization to expend up to $50 of public money to include only the actual expenditure of public funds to articulate and disseminate a policy-maker's opinion, contributions-in-kind, had they actually been proscribed by section 117, I do not believe would have been even partially permitted by such an authorization.

Until 1997, the restrictions placed on government offices by section 117 (then designated section 116) applied to "any election before the electorate" and expressly stated that none of the designated entities could "expend any public moneys from any source,

or make any contributions in kind." § 1–45–116(1)(a)(I), C.R.S.1973 (Supp.1996). With the repeal and readoption of the Act by initiative in the general election of 1996, the types of elections and issues included in the ban were delineated with greater particularity, and the term "contributions in kind" was replaced by "contributions." § 1–45–117(1)(a)(I), 1 C.R.S. (1987). Both before the amendment and at the time of the press-releases at issue here (and, in fact, until the adoption of Colo. Const. Art. XXVIII in the election of 2002), both of these terms—"contribution" and "contribution in kind"—were separate statutory terms of art. *See* § 1–45–103(4), (4.5), 1 C.R.S. (2002). "Contribution in kind" was not subsumed as a subset of "contribution," and as the majority itself points out, *see* maj. op. at 1012, personal services were defined by the statute as a "contribution in kind," not as a "contribution."

To the extent that an elected official himself (rather than the governmental entity) could possibly be considered to personally compensate his staff; and to the extent that assisting the elected official in formulating a position could possibly be considered a gift to an issue committee, *see* section 1–45–103(4.5)(a), 1 C.R.S. (2000)(defining contributions in kind to include personal services attributable to the person making compensation therefor), directing one's staff as the Treasurer did in this case would therefore still not have been proscribed by the FCPA. While a public official who orders the use of public resources for purposes other than those for which they are authorized may run afoul of other prohibitions against misusing or embezzling public property, he certainly does not violate the provisions of the Fair Campaign Practices Act by directing his staff to assist him. Even the majority apparently does not accuse the Treasurer of misappropriating government funds.

I therefore do not agree that the Treasurer's conduct was prohibited by the FCPA at all, but if it were, it nevertheless would not have been subject to a fine. Sanctions for violation of section 117 were provided by section 113 at all times pertinent to the Treasurer's conduct in this case. A civil penalty

of double the amount contributed was limited to "any person who intentionally violates any provision of this article relating to contribution limits." § 1–45–113(2), 1 C.R.S. (2002).

While it is arguable that these penalties were reserved for violations of section 1–45–105.3, entitled "Contribution Limits," and setting out specific amounts of the "combined total of contributions and contributions in kind" permitted for various elections, it is at least clear that the Act reserved the imposition of civil penalties for intentional violations of its provisions. The term "intentionally," which is used by the statute to define both criminal and civil penalties, is limited to a conscious objective to cause the specific result proscribed by the statute. *See* § 18–1–501(5), C.R.S. (2004). Unlike the typical criminal or proscriptive statute, in which a person is prohibited from intentionally committing particular acts or conduct, sanctions for campaign violations are expressly restricted to intentional violations of the Act itself.

Although ignorance of the law may not be a defense, fines for violation of the Act are therefore expressly limited to persons who not only know they are expending, but also intend to expend, public money or make contributions in a way that is prohibited by the Act. Especially in light of the Treasurer's protestations that he did not believe he was expending more than $50 of public money, the ALJ's finding that he intentionally had his staff assist him and intentionally issued the press releases was clearly inadequate to support a fine for intentionally violating the Act.

Finally, since (as the majority also points out) directing a governmental official's staff cannot constitute an expenditure of public moneys within the contemplation of section 117(1)(a)(I), 1 C.R.S. (2002), *see* maj. op. at 1012, I consider it equally incapable of falling within the statutory authorization to "expend not more than fifty dollars of public moneys in the form of letters, telephone calls, or other activities incidental to expressing [a policy-making employee's] opinion on any such issue," as contemplated by section 117(1)(a)(II). By its use of specific examples, the statute clearly contemplates allowing only the costs expended in reducing the official's opinion to a form that can be dissemi-

nated and the costs of actually disseminating it. Were this authorization to include the fair value of time spent by salaried governmental officers in formulating the opinion, the Treasurer should perhaps be most offended by the Administrative Law Judge's failure to include the value of the Treasurer's own time and effort in the calculus.[1]

Apart from the liberties taken by the majority with the language of the FCPA itself, it is difficult to imagine the General Assembly intending the unseemly (if not downright silly) minute counting exercise attempted by the ALJ to determine the fair market value of the Treasurer's staff's time. Perhaps more importantly, however, the attempt by both the ALJ and the majority to distinguish proper from criminally sanctionable use of an elected official's staff, based on whether the staff communicates its findings to him in the form of an intermediate internal memo or in the form of the ultimate press release, can only serve to dissuade open communication with the public about the very matters concerning which the official was elected to deal. Ironically, the intricacies of Amendment 23, about which the Treasurer was making dire economic predictions, in retrospect exemplifies the kind of ballot issue as to which full public knowledge would seem to be essential.

In response to the majority's conclusion that the FCPA applied to the Treasurer's conduct and that none of its provisions immunized his press releases from the limitations of the Act, see maj. op. at 1000, there is no question that it applied to his conduct, but I consider it perfectly clear that the FCPA has always permitted an elected official to express his opinion on any issue and that he could spend up to $50 of public money in doing so. Because the ALJ found that the Treasurer spent only about $17 in actual production and distribution costs, and because I do not believe the use of the Treasurer's staff as he did was prohibited by the FCPA, I respectfully dissent.

---

1. Interestingly, in support of its distinction between the Treasurer's time and that of his staff, the majority relies only upon an order of a trial court of another jurisdiction, having no precedential value even in its own jurisdiction, not construing the FCPA at all.